IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------x

C.S.B. COMMODITIES, INC.,

                Plaintiff,

          v.

URBAN TREND (HK) LTD., AND ROBERT KUSHNER,

                Defendants.

-------------------------------------------------------------x

Civil Action No. 1:08-cv-01548

Judge Robert M. Dow, Jr.
Magistrate Judge Morton Denlow

PLAINTIFF C.S.B. COMMODITIES, INC.'S
MEMORANDUM IN OPPOSITION TO
KUSHNER'S MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM

Plaintiff C.S.B. Commodities, Inc. ("CSB"), by its attorneys, hereby submits this Memorandum in Opposition to the motion [D.I. 27] made by defendant Robert Kushner ("Kushner") under Fed.R.Civ.P. 12(b)(6) seeking dismissal of the Amended Complaint [D.I. 24] for allegedly failing to state a claim against him individually.

Briefly, the Amended Complaint states a claim against Kushner individually, as he is the person at Urban Trend (HK) Ltd ("Urban Trend" – Kushner's co-defendant) who directed Urban Trend's infringement by selecting the infringing product, approving the infringing product, and marketing the infringing product. That is sufficient for Kushner to be liable personally for his own acts without regard to whether he is an officer of Urban Trend.

## I.   FACTS

C.S.B. is a New York corporation engaged in the business of selling housewares (Declaration of Robert Schmeizer, ¶ 4; hereinafter: "Schmeizer Dec., ¶ ___"). One of C.S.B.'s products is a knife holder with a distinctive shape, namely that of a human figure leaning slightly backwards, with knife slots positioned throughout the figure's

"body" (a photograph of C.S.B.'s product is Exh. A to the Amended Complaint; hereinafter "Am. Comp."). The falling down figure has acquired distinctiveness as an indicator identifying the origin of knife holders offered for sale IN that configuration, and has become known as "the little red man" (Schmeizer Dec., ¶ 5; Am. Comp. Exh. D). The knife holder is sold under the trademarks THE EX and VOODOO. (Schmeizer Dec., ¶ 5).

C.S.B. learned that Urban Trend was seeking to introduce into the market a knife holder that traded on the popularity of the little red man knife holder. (Schmeizer Dec. ¶ 6). Urban Trend's knife holder was named the Throwzini, and incorporated the little red man into a knife holder with a different configuration (Schmeizer Dec., ¶ 7; Am. Comp. Exhibit B is a photograph of the Throwzini knife holder). C.S.B. believed that the Throwzini knife holder constituted an infringement of C.S.B.'s exclusive rights in the little red man as an indication of origin for a knife holder, and initiated discussions with Urban Trend, through its president, Kushner, to resolve the dispute. (Schmeizer Dec. ¶ 8). That proved unavailing. Urban Trend, with Kushner at the helm guiding the infringement, continued to market and sell the infringing Throwzini knife holder, including through a personal trip to Chicago to attend a trade show and market the Throwzini. (Schmeizer Dec., ¶ 9).

C.S.B. has alleged in the Amended Complaint that:

> Kushner was the individual at Urban Trend who made the decision to go forward with the manufacture and/or marketing of the Throwzini knife holder and thereby trade on the goodwill associated with the EX/VOODOO knife holder and the Human Figure Design (Am. Comp. ¶ 20);

> Kushner personally selected the configuration of the Throwzini knife holder and therefore deliberately and purposefully sought to trade on the goodwill established by C.S.B. in the EX/VOODOO knife holder (Am. Comp. ¶ 21);

Kushner personally directed others at Urban Trend to manufacture or have manufactured the Throwzini knife holder and to market the Throwzini knife holder in this district (Am. Comp. ¶ 22);

Kushner has been personally present in this district to offer the Throwzini knife holder for sale (Am. Comp. ¶ 23); and

Kushner stands to gain personally from the sales of the Throwzini knife holder (Am. Comp. ¶ 24).

The statements of the Amended Complaint have not been denied by Kushner, who has offered no affidavit on his own behalf claiming a lack of involvement in the events described above.

## II.    ARGUMENT

The Amended Complaint states a claim against Kushner for which relief may be granted. The Amended Complaint clearly alleges that Kushner personally guided the acts of Urban Trend to infringe C.S.B.'s intellectual property rights. An officer of a corporation who personally directs the corporation to infringe is personally liable for those acts. *David Berg & Co. v. Gatto Intl. Trading Co., Inc.*, 884 F.2d 306, 311 (7th Cir. 1989) ("Every person actively partaking in, lending aid to, or ratifying and adopting such acts [*i.e.*, trademark infringement and unfair competition] is liable equally with the party itself performing these acts."). Kushner cannot hide behind Urban Trend's corporate form to insulate himself from answering for his own tortious conduct. *GMAC v. Synergy Corp.*, 1992 WL 77682, at *1 (N.D. Ill. April 7, 1992 -- Exhibit 1 hereto) ("An officer can be found liable for any torts in which he took part even if he was acting on behalf of the corporation."). Kushner's motion should be dismissed in its entirety.

A.    STANDARDS FOR A MOTION UNDER FED.R.CIV.P. 12(B)(6)

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), all well-pleaded allegations in the complaint are accepted as true. *Turner/Ozane v. Hyman/Power,* 111 F.3d 1312, 1319 (7th Cir. 1997).   The court must accept a pleading's factual allegations because "a motion to dismiss tests the legal sufficiency of a pleading." *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675 (7th Cir. 2001).

Dismissal of the complaint "is granted only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). Any ambiguities in the complaint are construed in favor of the plaintiff. *Kelley v. Crosfield Catalysts,* 135 F.3d 1202, 1205 (7th Cir. 1998).

The Seventh Circuit articulated the standard for evaluating the sufficiency of a pleading under Fed.R.Civ.P. 12(b)(6):

> Plaintiffs need not plead facts; they need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of. [The plaintiff] has done that; it is easy to tell what she is complaining about. Any district judge (for that matter, any defendant) tempted to write "this complaint is deficient because it does not contain..." should stop and think: What rule of law *requires* a complaint to contain that allegation? Rule 9(b) has a short list of things that plaintiffs must plead with particularity . . . *Doe v. Smith,* 429 F.3d 706, 708 (7th Cir. 2005).

C.S.B. has met this standard.

B.    THE AMENDED COMPLAINT SUFFICIENTLY ARTICULATES A
        CLAIM AGAINST KUSHNER PERSONALLY.

The primary case upon which Kushner relies, *Dangler v. Imperial Machine Co.,* 11 F.2d 945 (7th Cir. 1926), is not directly on point because 1) *Dangler* was decided after

a full trial on the merits, rather than on a motion to dismiss, and 2) it was decided prior to the introduction of the Federal Rules of Civil Procedure. Thus, *Dangler* provides no guidance in interpreting the sufficiency of a pleading under Fed.R.Civ.P. 12(b)(6).

The case closest to the facts of this case is, instead, *Peaceable Planet, Inc. v. TY, Inc.*, 185 F.Supp.2d 893 (N.D. Ill. 2002). In *Peaceable Planet*, the plaintiff alleged the personal liability of the president and CEO of the corporate defendant. The president moved to dismiss under Fed.R.Civ.P. 12(b)(6). The plaintiff had argued that the "special showing" required by *Dangler* to pursue an infringement claim against an individual officer of an infringing corporation was met. The complaint therein alleged that the individual defendant was the president of the corporate defendant, its founder, CEO and sole shareholder. The complaint further alleged that the individual officer: (1) "[was] responsible for overseeing" the development, marketing and sales of the infringing products; (2) "personally participate[d]" in the design and naming of all of the corporate defendant's products, including the specific one in issue; (3) "approve[d], direct[ed] and approve[d] the final design" of the accused products; (4) "approved and authorized" the corporate defendant's actions; and (5) "personally promoted, offered for sale, and sold" the infringing product. *Peaceable Planet, Inc.*, 185 F.Supp.2d at 896-97.

These allegations were deemed sufficient to make out a case against the individual defendant, and withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The cases cited by Kushner are not nearly as apposite as *Peaceable Planet* on the facts of this case.

Kushner cites *DEV Industries, Inc. v. Rockwell Graphic Systems, Inc.*, No. 91 C 7197, 1992 WL 100908, at *1, *3 (N.D. Ill. May 4, 1992), in which the plaintiff alleged

that individual officers of the defendant corporation had been engaged in a "complex and integrated scheme to eliminate [plaintiff] as a competitor and to drive it out of business," that they were "the moving, conscious, and dominant force" behind corporate defendant's unfair trade practices, and that they knew about and/or encouraged the corporate defendant's allegedly offending conduct.  In dismissing claims against the individual defendants, the court found that the plaintiff's allegations were insufficient for failing to identify any *specific* activity based upon personal knowledge or wrongdoing, as opposed to their membership in the broader organizational structure. *Id.* at *3.  Here, however, C.S.B. has alleged specific activity in which Kushner has engaged:  choosing the product, supervising its manufacture and marketing, and personally participating in its marketing.  Thus, C.S.B. has exceeded the minimum pleading requirements for stating a claim against Kushner, and the facts of *DEV* make it less applicable than *Peaceable Planet.*

In another case cited by Kushner, *The Drink Group, Inc. v. Gulfstream Communications, Inc.,* 7 F.Supp.2d 1009 (N.D. Ill. 1998), the plaintiff sought to hold corporate officers individually liable for trademark infringement on the ground that they were "a principal of and a driving force behind" the allegedly infringing conduct. The court dismissed these claims, citing *Dangler* and *Hoover Group, Inc. v. Custom Metalcraft, Inc.,* 84 F.3d 1408, 1411 (Fed. Cir. 1996), in which the court had explained that "when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation." In *Drink Group,* plaintiff failed to allege *any* acts of wrongdoing by the defendant officers. *Id.* at 1010-11. The mere fact that these individuals had formed a

corporation that allegedly infringed was insufficient, absent any allegations of improper motivation. *Id.* at 1011. In other words, the court found that "[p]laintiff's averments fall woefully short of the 'special showing' requirement in *Dangler.*" *Id.* Here, C.S.B. has provided specific averments, and so *Drink Group* is not applicable.

In another case on which Kushner relies, *Cinema Concepts Theatre Serv. Co. v. Filmack Studios,* 1989 WL 55092 (N.D. Ill. 1989), the court dismissed a claim for contributory copyright infringement on the ground that there were no factual allegations to establish that the individual defendants supervised, influenced, or otherwise knowingly participated in the alleged infringement, or that either defendant derived financial benefit from it. That is not the case, here, where the allegations of the Amended Complaint, as set forth above, are that Kushner supervised, influenced, knowingly participated in and derived financial benefit from the infringements.

In *FM Industries, Inc. v. Citicorp Credit Services, Inc.*, 2007 WL 4335264 (N.D. Ill. 2007), the plaintiff merely alleged that the individual defendants were corporate officers and therefore liable for the acts taken by the corporation. Not surprisingly, that was deemed insufficient to withstand a motion to dismiss.

In *Powder Power Tool Corp. v. Powder Activated Tool Co.*, 230 F.2d 409 (7th Cir. 1956), the Seventh Circuit reversed a trial judge's ruling finding personal liability of a corporate officer after trial, but did not address the sufficiency of the complaint as it pertained to the minimum allegations which need be made to withstand a motion to dismiss.

Thus, none of the cases on which Kushner relies suggest that the allegations of the Amended Complaint herein are insufficient to withstand a motion to dismiss.

Furthermore, many other opinions from courts in this District have found corporate officers individually liable in cases of infringement of intellectual property rights or have denied motions to dismiss for failure to state a claim against the individual officer. For example, in *Cooper Indus., Inc. v. Juno Lighting, Inc.,* 1 U.S.P.Q.2d 1313 (N.D. Ill. 1986), aff'd, 1987 WL 38103 (Fed. Cir. 1987), the Court denied a motion to dismiss for failure to state a claim, finding that the complaint sufficiently alleged personal liability where it alleged that the individual defendant was the founder, president, and majority shareholder of the company and the moving force behind the infringing activities and that his part in the infringing actions was willful. C.S.B.'s allegations are more substantial and detailed than the allegations in *Cooper*.

Other cases are in accord, *e.g., Sethness-Greenleaf, Inc. v. Green River Corp.,* 1994 WL 67830, at *7 (N.D. Ill., Feb. 11, 1994 -- Exhibit 2 hereto) (holding on a motion for summary judgment that a corporate officer who personally participated in the infringing activity was personally liable for the infringement); and *Sparks Tune-Up Ctrs., Inc. v. Panchevre,* 1992 WL 211029, at *6 (N.D. Ill., Aug. 21, 1992 -- Exhibit 3 hereto) (on a motion for summary judgment, recognizing that a corporate officer is individually liable for trademark infringement when he "performs the act or does the things that the patent or trademark law protects against").

No precedent exists for dismissing a complaint for failing to state a claim, and thereby allowing a corporate officer to escape personal liability for his own conduct, where that officer was as intimately involved with the infringing conduct as Kushner has been here. The Amended Complaint specifies Kushner's action that bear out the claim

for relief sought, and thus contains sufficient allegations to make out a case establishing

Kushner's responsibility for his own actions.

## III.    CONCLUSION

For all of these reasons, it is respectfully urged that the Court deny Kushner's

motion to dismiss for failure to state or claim.  The acts of which C.S.B. has complained

are sufficient to show Kushner's *personal* conduct with respect to the acts alleged and

those facts, which must be taken as true, make more than a showing of a *prima facie* case

against Kushner personally, particularly in the absence of *any* factual showing or denials

by him.


Dated:  July 1, 2008                                        By: _____
                                                            Martin D. Pavane, Esq.
                                                            Lisa A Ferrari, Esq.
                                                            Roger S. Thompson, Esq.
                                                            COHEN PONTANI LIEBERMAN & PAVANE LLP
                                                            551 Fifth Avenue
                                                            Suite 1210
                                                            New York, New York 10176
                                                            (212) 687-2770

                                                            Steven H. Sklar, Esq.
                                                            LEYDIG, VOIT & MAYER, LTD.
                                                            Two Prudential Plaza – Suite 4900
                                                            180 North Stetson Avenue
                                                            Chicago, IL  60601-6780
                                                            Tel.:  (312) 616-5600
                                                            Fax:  (312) 616-5700

                                                            Attorneys for Plaintiff
                                                            C.S.B. COMMODITIES, INC.

## <u>CERTIFICATE OF SERVICE</u>

       Steven H. Sklar, an attorney, certifies that he served a copy of the foregoing Plaintiff C.S.B. Commodities, Inc.'s Memorandum in Opposition to Kushner's Motion to Dismiss for Failure to State a Claim on counsel of record for all parties entitled to service, as listed below, by electronic mail and by electronically filing same in accordance with the Court's electronic filing requirements on July 1, 2008:

       Jeffrey G. Mote
       James J. Lukas, Jr.
       GREENBERG TRAURIG, LLP
       77 West Wacker Drive, Suite 2500
       Chicago, Illinois 60601

                    /s/  Steven H. Sklar
                    Steven H. Sklar

# EXHIBIT 1



Not Reported in F.Supp.                                                                                                 Page 1
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

General Motors Acceptance Corp. v.
Synergy Corp.
N.D.Ill.,1992.
Only the Westlaw citation is currently
available.
    United States District Court, N.D. Illinois,
                Eastern Division.
    GENERAL MOTORS ACCEPTANCE
       CORPORATION, Plaintiff,
                    v.
SYNERGY CORPORATION, Theo D'Oro,
  National Vehicle Placement Management
  Consultants, Inc., and Michael Jacobs,
                Defendants.
           **No. 90 C 3522.**

              April 7, 1992.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge
**\*1** General Motors Acceptance Corporation
("GMAC") has filed a complaint alleging
violations of the Lanham Act, 15 U.S.C. §
1125(a), and the Illinois Deceptive Trade
Practices Act ("IDTPA"), Ill.Rev.Stat., ch.
121 1/2 , § 312, as well as alleging tortious
interference with contract. Defendants,
National Vehicle Placement Management
Consultants, Inc. ("National") and Michael
Jacobs ("Jacobs"), the President of National,
have moved for summary judgment.

                  FACTS

GMAC finances the purchase of motor
vehicles by its customers through retail
installment contracts and lease agreements.

The motor vehicle is GMAC's collateral in
connection with such contracts. GMAC can
repossess the vehicles in the case of a
default. The contracts specify that a
customer may not sell or transfer a vehicle
without GMAC's approval. GMAC
complains that defendants are interfering
with its contractual relations with customers
by inducing them to transfer their cars, in
violation of their contracts, to vehicle
brokerages established by National (the
"brokerages").

National is in the business of establishing
vehicle brokerages which resell or release
vehicles. According to GMAC, the
brokerages use newspaper advertisements
and other means to induce GMAC
customers to assign them their retail
installment sales contracts and leases. Some
GMAC customers have transferred their
vehicles in apparent violation of contract.
The transfers were not made to National, but
to the brokerages National had established
and to whom National continued to provide
consulting services. National acknowledges
providing certain form contracts, training
employees, coordinating advertisements
among brokerages, and referring customers,
but denies any wrongdoing. National
contends that if any violations occurred, the
brokerages alone are liable.

                DISCUSSION

To prevail in a motion for summary
judgment, the moving party must establish
there are no genuine issues of material fact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court must construe all factual inferences in the light most favorable to the non-moving party. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984).

### I. The Counts Against Jacobs

Defendants first contend that the court should grant summary judgment in favor of Jacobs because he acted solely as the employee and agent of National. They argue the corporate veil cannot be pierced in this case. Defendants are not correct. An officer can be found liable for any torts in which he took part even if he was acting on behalf of the corporation. *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir.1985); *Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089, 1093 (N.D.Ill.1985). Because Jacobs cannot hide behind his agency role, the court denies his motion for summary judgment on Counts I, II, and III.

### II. The Lanham Act Count

Construed in the most favorable light, plaintiff alleges two alternative theories under the Lanham Act. First, plaintiff suggests National aided the brokerages in deceiving customers. The Lanham Act provides, in pertinent part:

**\*2** Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading representation of fact, which-(2) in commercial advertising or promotion, misrepresents the nature, character, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable.

15 U.S.C. § 1125(a). Plaintiff alleges that defendants assisted the brokerages in misleading GMAC's customers into believing that assigning their contracts would not infringe the rights of GMAC.

Second, plaintiff indicates National misled the brokerages themselves into believing their actions were within the law. Plaintiff alleges that National led the brokerages to believe that transfer of the lienholder's collateral, the vehicles, would not infringe on the lienholder's rights.

Plaintiff fails to distinguish its theories clearly, but at least the first theory sufficiently alleges a claim for contributory misrepresentation that defeats summary judgment. Defendants argue that, as mere consultants to the brokerages, they cannot be liable for any wrongdoing. Defendants point out that the consulting agreements specifically delineate that the brokerages are separate entities and that National has no control over their operations. Defendants' arguments about control of the brokerages is not a sufficient basis for summary judgment on this count. The Seventh Circuit has found that a corporation or a person may be held liable for contributory trademark infringement under the Lanham Act without directly deceiving customers. *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir.1989). Although this is more accurately a case of contributory misrepresentation than contributory infringement, the same analysis applies. For contributory liability, one must have knowledge, or reason to know, of the infringing activity of the primary infringer. *Id.* What National knew of the activities of the brokerages is a question of fact which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

the court cannot resolve at this time. At trial, the court can determine if National induced the brokerages to misrepresent the nature of their activities to GMAC customers or knowingly aided them in interfering with GMAC's contract rights.

GMAC has met its burden to defeat summary judgment. It has sufficiently identified portions of National's promotional materials which could be construed as intended to induce the brokerages to mislead customers. In addition, the Jacobs' affidavit indicates he may have had reason to know of the brokerages' activities. The court does not impute the statements of the brokerages to National but rather looks to the statements of National itself. On this basis, the court denies defendants' motion for summary judgment on Count I.

### III. The Interference With Contractual Relations Count

In Count II, GMAC alleges that National intentionally and maliciously induced GMAC customers to breach their contracts. Plaintiff alleges defendants provided assistance to the brokerages for the purpose of enabling them to induce the contract breaches. Defendants ask for summary judgment on the ground that plaintiff never alleges any direct interference, or even contact, with the customers by defendants. Defendants suggest that plaintiff's only legitimate cause of action is against the brokerages. Defendants ignore the possibility that a defendant may be liable for substantially assisting another party to commit a tort.

**\*3** Plaintiff has offered sufficient evidence to defeat summary judgment. It has alleged

that National coordinated and facilitated the brokerages' communications with customers and that National provided the contract forms for the transfer of the vehicles. Whether these acts were intended to enable the brokerages to interfere with GMAC's contractual relations is a question of fact which cannot be resolved on summary judgment. Plaintiff's affidavits support its contention that defendants at least had knowledge of the brokerages' activities. While the language of the form contracts and the consulting agreements, at best, only marginally support plaintiff's allegations, the court will give plaintiff a chance to make its case. Defendants' intent and knowledge are the key factors in determining whether its indirect actions can support a claim of liability for interference with contractual relations. Therefore, the court denies defendants' motion for summary judgment on Count II.

### IV. The IDTPA Count

Plaintiff alleges defendants engaged in conduct which created "a likelihood of confusion or of misunderstanding" in violation of the IDTPA. Ill.Rev.Stat., ch. 121 1/2 , § 312. Defendants again argue that plaintiff has produced insufficient evidence to show that defendants personally engaged in such conduct. Defendants suggest that the proper defendant for this claim is the brokerages.

Plaintiff, however, alleges direct action by defendants in Count III. Count III is apparently based on plaintiff's second theory, that defendants attempted to deceive the brokerages. GMAC points to defendants' promotional materials which allege that the transfer of lienholder's collateral would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

Page 4

"benefit all parties concerned." To prevail under the IDTPA, plaintiff need not prove actual confusion or misunderstanding. Although in the context of the entire bulk of promotional materials, documents, and communications with the brokerages, the possibility of confusion or misunderstanding may be less than plaintiff claims, for purposes of a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. On that standard, the promotional material creates a question of material fact which defeats summary judgment.

CONCLUSION

The court denies defendants' motion for summary judgment.

IT IS SO ORDERED.

N.D.Ill.,1992.
General Motors Acceptance Corp. v. Synergy Corp.
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2



Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

▶   Sethness-Greenleaf, Inc. v. Green River Corp.
N.D.Ill.,1994.

United States District Court, N.D. Illinois, Eastern
Division.
SETHNESS-GREENLEAF, INC., an Illinois
Corporation, Plaintiff-Counterdefendant,
v.
GREEN RIVER CORPORATION, a Minnesota
Corporation (Counterplaintiff); and First National
Bank in Olney, a national banking corporation,
Daniel J. Meyers, and Northwestern Extract
Company, a Wisconsin corporation, Defendants.
GREEN RIVER CORPORATION, a Minnesota
corporation, Third-Party Plaintiff,
v.
J. Barry MCRAITH, Third-Party Defendant.
GREEN RIVER BOTTLING CO., an Illinois
corporation, Plaintiff-Counterdefendant,
v.
GREEN RIVER CORPORATION, a Minnesota
corporation, and Daniel J. Meyers, Defendants-
Counterplaintiffs.
GREEN RIVER CORPORATION, a Minnesota
corporation and Daniel J. Meyers, Third-Party
Plaintiffs,
v.
A-BARR SALES, INC. an Illinois corporation;
Sethness-Greenleaf, Inc., an Illinois Corporation;
Bernard Barc; George M. Sundheim; and J. Barry
McRaith, Third-Party Defendants.
**Nos. 89-C-9203, 91-C-4373.**

Feb. 11, 1994.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.
**\*1** On November 12, 1993, the Court granted
Plaintiff Sethness-Greenleaf, Inc.'s Motion for Partial
Summary Judgment, and denied a similar motion by
the Defendants, Green River Corporation ("GRC")
and GRC's president, Daniel J. Meyers. *See Sethness-
Greenleaf, Inc. v. Green River Corp.,* 89-C-9203, slip
op. (N.D.Ill. Nov. 12, 1993). That decision resolved
the primary issue in this litigation: whether GRC
defaulted under the parties' contract for the sale of the
Green River soft drink trademark and formula. The
court found that GRC had defaulted.

Sethness-Greenleaf, Inc. ("S-G") now moves for
summary judgment on the remaining counts in its
Complaint, an amendment to that Complaint, and a
supplemental complaint. S-G moves for summary
judgment on several counterclaims and third party
claims alleged by Defendants, and also moves to
dismiss the remaining claims of the Defendants. In
addition, the First National Bank of Olney (the
"Bank"), the escrow agent for the escrow items in
dispute, has filed a petition for attorneys' fees, which
is opposed in part by S-G.

This litigation has long been delayed. The Court
recently was directed by the Seventh Circuit to
promptly bring this litigation to resolution. *See Green
River Bottling Co. v. Green River Corp.,* 997 F.2d
359, 363 (7th Cir.1993) (stating that the case should
proceed "forthwith to trial and judgment"). While a
trial on liability is not now necessary, given the
mandate from the Court of Appeals, the Court
proceeds with the instant motions for summary
judgment, despite the fact that Plaintiff has not filed a
Rule 12(m) statement in support of the motions, does
not direct the Court to previously filed documents by
way of incorporation or reference, cites but a total of
three cases in support of its motion, and does not
attempt to recite the evidence that supports the
requested judgment. In fact, the only attention given
any matter before the Court is S-G's defense of the
Bank's fee petition. Had Plaintiff combed through the
evidence and arguments in support of its own motion
as well as it had the fee petition, submitting the
necessary supporting evidence and arguments, entry
of judgment on today's motion might have been
possible. However, given the record currently before
the Court, further proceedings are necessary.

BACKGROUND

The facts in this case are summarized in several other
orders and will not again be repeated. *See Sethness-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

*Greenleaf, Inc. v. Green River Corp.,* No. 89-C-9203, slip op. (N.D.Ill. Nov. 12, 1993); *Sethness-Greenleaf, Inc. v. Green River Corp.,* No. 89-C-9203, slip op. (N.D.Ill. Sept. 14, 1992); *Sethness-Greenleaf, Inc. v. Green River Corp.,* No. 89-C-9203, slip op. (N.D.Ill. July 24, 1992). The Court discusses the procedural background and relevant facts as is necessary.

On December 12, 1989, the Defendants removed this case, and Plaintiff's original five count Complaint to this Court.[FN1] On that date, and later on December 29, 1989, the Defendants filed an answer, and then an amended answer in which they stated counterclaims against S-G and third party claims against S-G's president, J. Barry McRaith. On February 22, 1990, S-G filed an amendment to the Complaint, adding a sixth count.[FN2] On November 1, 1990, after the Court first granted and then reconsidered Plaintiff's Motion for Partial Summary Judgment, Plaintiff filed a supplement to its Complaint adding five more counts.[FN3] On November 27, 1990, the Defendants filed a supplemental answer to that supplemental complaint and added three additional counts against S-G and McRaith. On December 7, 1990, S-G and McRaith moved to dismiss the Defendants' supplemental counts.

**\*2** In total, Plaintiff alleged eleven counts against GRC and Meyers. GRC and Meyers alleged a total of twelve counts against S-G and McRaith. On November 12, 1993, the Court resolved the first Count of Plaintiff's Complaint. The Court now addresses the remaining claims in this case. For the following reasons, Plaintiff's Motions are granted in part. Two further steps may be necessary to resolve this litigation. First, with respect to certain issues related to damages, Plaintiff shall submit a memorandum on damages within fourteen days of the date of this Memorandum Opinion and Order. Defendants may respond within seven days thereafter. Second, the Court will schedule a hearing, if necessary, with respect to Plaintiff's actual damages and any remaining issues.

ANALYSIS

*I. Plaintiff's Motion for Summary Judgment on the Remainder of its Claims*

A. Counts II-VI.

1. Defendants' Admission of Liability

In counts II through VI, S-G seeks to recover on outstanding invoices and notes GRC owes S-G for purchased quantities of S-G's products. Counts II and III seek payment of $61,098.51 reflected in S-G's invoices, dating from October 7, 1988 to August 29, 1989, reflecting purchases of syrups, Green River concentrate, and amortization charges for GRC's installation purchase of the escrow items, including the trademark and "secret formula" for the Green River Concentrate. Counts IV, V, and VI seek payment on three notes, a demand note in the amount of $10,000, an installment note in the amount of $15,747.33, and a demand note in the amount of $5,000. With respect to these Counts, Defendants do not deny that the Court's ruling of November 12, 1993 dictates judgment for the Plaintiff. The Defendants, contend, however, that the Court's November 12 Memorandum Opinion and Order was deficient because it failed to address one of their arguments.

2. The November 12 Memorandum Opinion and Order

In their response to Plaintiff's current motions Defendants state:

They are discouraged by this Court's rulings to date. They presume that if the Court did not deem, *inter alia,* their course of dealing arguments worthy of acknowledgement and response in the recent summary judgment proceedings on Count I, the Court will be even less willing to consider their allegations regarding S-G/McRaith's deliberate attempts to harm them and their business.

(Defs.' Resp. to Mot.Summ.J. at 2.) Contrary to this statement, the Court considered Defendants' course of dealing argument in the November 12 Memorandum Opinion and Order. At pages 13 through 17, the Court addressed the argument, asserted by Defendants since July 13, 1990, that the parties impliedly contracted for an extension of credit. Although the Court did not use the words "course of dealing", the Court stated Defendants' position as follows:
Meyers argues that despite his inabilities to supply any specifics regarding his purported credit agreement with McRaith, this Court should (1) find

Not Reported in F.Supp.                                                                                         Page 3
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

that a contract existed based on the parties' course of conduct, and (2) add an implied term to that contract, that payment would be made in a "reasonable" time.

**\*3** *Sethness-Greenleaf, Inc. v. Green River Corp.*, No. 89-C-7203, slip op. at 13 (N.D.Ill. Nov. 12, 1993). The Court found that the parties' course of dealing had not created the purported contract because there had been no meeting of the minds on a bargained for credit extension and that neither party believed S-G was bound to extend credit. Rather, the Court concluded that the parties did not intend to be bound by any credit agreement. *Id.* at 14. The parties' course of conduct, or "course of dealing" as Defendants' would prefer, does not create a genuine issue of fact as to credit terms not supported by any evidence of the parties' intention that S-G be bound. The most pertinent evidence in this regard is Meyers's admission that the credit agreement was to last only as long as McRaith agreed to ship product. *See id.* at 9-10. Meyers admitted that McRaith was not bound to extend him credit beyond any particular instant. Given this admission, the parties' "course of dealing" does not create any contrary intention.

Furthermore, as the Court expressly stated, GRC has defaulted under the terms of its own interpretation of the contract. Even if GRC were entitled to a "reasonable time" in which to pay its outstanding debt, it has never made an unconditional tender of payment. As this litigation is now into its fourth year, the Court cannot but conclude, as a matter of law, that any "reasonable time" for payment has elapsed.

As a result, the Court's decision with respect to the instant motion is in no way undermined by its failure to use the term "course of dealing" when ruling on Count I.

### 3. Restitution

Given Defendants' failure to object on substantive grounds to the entry of judgment on these Counts, Plaintiff's motion will be granted. However, one issue remains unaddressed. Plaintiff has failed to provide the Court with legal and factual authority supporting the amount of its damages.

By declaring an "event of default" under the Escrow agreement based on GRC's failure to purchase product under section 2.2(b) of the Purchase

agreement, Plaintiff essentially declared the purchase of the escrow items forfeited. Plaintiff may not now sue for both forfeiture of the escrow items and for damages based on the sale of the escrow items. *See Dahm, Inc. v. Jarnagin,* 478 N.E.2d 641, 643 (Ill.App.Ct.1985) (stating that a vendor under an installment contract cannot both forfeit the contract and sue on it for damages). While Plaintiff is entitled to payment for goods purchased, it is not entitled to payment for outstanding amortization charges. To the extent that Plaintiff seeks payment for outstanding amortization charges, the Defendants may be entitled to a setoff against sums owed for the purchase of syrup and concentrate. The amount of such a setoff is unclear and has not been addressed by the parties.

At minimum, Plaintiff is not entitled to payment on \$7,460 in amortization charges included in its request for payment of \$61,098.51 in counts I and II. Whether the Defendant is entitled to credit for amortization charges reflected in any of the notes or credit for past paid amortization charges, the Court does not now decide. However, a review of the invoices submitted by GRC in its Appendix to its Reply in Support of its Rule 59(e) motion indicates that GRC was charged amortization charges well before the invoices totalling \$61,098.51 were sent.[FN4] Further, the evidence submitted in this case indicates that, after S-G demanded payment on the invoices, GRC did make two payments totaling \$7,460. S-G's request for judgment neither credits nor explains these payments. The Court cannot enter judgment on the requested monetary awards until these issues are resolved.

**\*4** Accordingly, with respect to Counts II-VI, Plaintiff's Motion for Summary Judgment is granted, subject to the Plaintiff's filing with the Court a memorandum addressing the legal and factual issues here noted, within fourteen days of the date of this order. Defendants to respond seven days thereafter.

#### *II. Attorneys' Fees Under the Manufacturing Agreement.*

Plaintiff seeks attorneys' fees under the Purchase Agreement. The agreement, in part, says:

9.1) *Indemnification of Seller.* Buyer shall indemnify and hold Seller harmless from and against all losses or damages suffered by Seller (including reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

attorneys' fees) which arise out of, relate to, pertain to or concern any misrepresentation by Buyer, or any failure of Buyer to disclose any material fact necessary to make any statement herein or in any other document furnished by Buyer to Seller not misleading, or any breach of Buyer's warranties and representations hereunder, or any breach, nonfulfillment or nonperformance by Buyer of any of its covenants, duties or obligations hereunder.

(Purchase Agreement, Article IX, Section 9.1.) Defendants object to the requested award but direct the Court to no authority justifying their position.

Excepting an unconscionable agreement, terms of a contract providing for reasonable attorneys' fees in the event of litigation are enforceable like any other contractual term, so long as the requested fees do not exceed an amount that would be impermissible if contained in a liquidated damages clause. *See Equitable Lumber Corp. v. IPA Land Dev. Corp.,* 344 N.E.2d 391, 396-97 (N.Y.1976) (holding that a contractually agreed sum for attorneys' fees should be remanded for a determination whether the sum exceeded that permitted in liquidated damages as provided in Uniform Commercial Code § 2-718); *Puget Sound Mut. Sav. Bank v. Lillions,* 314 P.2d 935 (Wash.1957) (stating that attorneys' fees are "as much a part of the obligation of the contract as any other part."), *cert. denied,* 357 U.S. 926 (1958).

Given the broad provision for attorneys' fees provided in Section 9.1 of Article IX of the Purchase Agreement, the Court finds that the section applies to this case. Plaintiff is entitled to reasonable attorneys' fees for the litigation over GRC's default, whether the default is classified as a breach, nonfulfillment, or nonperformance. Of course, the Court cannot determine whether the sum requested by Plaintiff is reasonable at this time. S-G has not submitted the amount of their requested fees for consideration.

The details of Plaintiff's fee request, with supporting authority, shall be submitted to the Court in the previously mentioned damages memorandum.

### III. Count VII

In Count VII, S-G seeks a permanent injunction enjoining GRC and Daniel J. Meyers from manufacturing, marketing, distributing, using, or selling any imitation Green River concentrate or derivative products. S-G also seeks a mandatory injunction ordering GRC and Daniel J. Meyers to recall imitation Green River products. With respect to Count VII, Plaintiff's Motion for Summary Judgment is granted in part and denied in part.

**\*5** On May 28, 1993, S-G agreed to permit GRC to continue to manufacture and market substitute Green River products if the word "original" were removed from the products' labels and other advertising. The Court specifically indicated that this agreement would not constitute a "waiver" of any of S-G's rights. Now that the Court has determined that S-G is entitled to the escrow items, including the Green River trademark, GRC must be enjoined from future manufacturing, marketing, distributing, using, or selling any imitation Green River products. The Court's indication, in its November 12 Memorandum Opinion and Order, denying S-G's request for a preliminary injunction as moot, does not prohibit this result, as GRC contends. That decision merely resolved S-G's request for a *preliminary* injunction; it did not resolve the parties' permanent rights. The Court contemplated S-G's current request for injunctive relief and expected to grant that request.

S-G also requests that GRC be ordered to recall all remaining Green River products that it has already sold pursuant to the May 28, 1993 agreement. That agreement contained no provision regarding a post-judgment recall of the distributed goods. As a result, GRC contends that S-G has waived the issue. However, as indicated above, S-G clearly did not waive any such rights.

In the opinion of the Court, this is an equitable matter to be decided on facts not now before the Court, as indicated in the Court's discussion of section 1118 of the Lanham Act below. *See* Section IV.B.2., *infra.*

Accordingly, with respect to Count VII, Plaintiff's Motion is granted in part and denied in part.

### IV. Count VIII.

In Count VIII, S-G seeks to recover under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), and seeks remedies under 15 U.S.C.A. § 1117 (West Supp.1993) and under 15 U.S.C. § 1118 (1988).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

A. Lanham Act Section 43(a)

In the opinion of the Court, there is no genuine issue of material fact as to GRC's violation of Section 43(a) the Lanham Act. Section 43(a) says that a person who falsely describes or represents certain products will be liable to "any person who believes that he is or is likely to be damaged by" the false advertising. 15 U.S.C. § 1125(a) (1988). To prove a claim under Section 43(a), a plaintiff must show that a defendant's representations were (1) false and misleading; (2) actually deceiving or likely to deceive a substantial segment of their audience; (3) material in their effects on purchasing decisions; (4) touting goods entering interstate commerce; and (5) actually injuring or likely to injure the plaintiff. *Truck Components, Inc. v. K-H Corp.*, 776 F.Supp. 405, 408 (N.D.Ill.1991). While neither party has addressed itself directly to any of these elements, the Court concludes, based on previous materials submitted, and the Seventh Circuit's decision in *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359 (7th Cir.1993), that summary judgment is justified.[FN5]

*6 It is undisputed that GRC sold a lime flavored soft drink bearing the "Green River" trademark, traditional trade dress and the label "original." This substitute drink was distributed without the consent of S-G, which, at the time, maintained a security interest in the Green River trademark and other escrow items. Although GRC has maintained that it was entitled to ownership of the escrow items, the Court has now determined that GRC forfeited any such right by defaulting under the purchase agreement. *See Sethness-Greenleaf, Inc. v. Green River Corp.*, No. 89-C-9203, slip op. (N.D.Ill. Nov. 12, 1993). Furthermore, regardless of GRC's ownership rights, S-G retained all rights to manufacture Green River concentrate until the completion of the sale of the escrow items. (*See* Manufacturing Agreement ¶ 1.a.) GRC was not entitled to arrange for alternate production of concentrate without S-G's consent. (Manufacturing Agreement 1.c.) Until GRC's rights to the escrow items completely vested, GRC was not entitled to use of the Green River trademark outside the bounds of the Purchasing, Manufacturing, and Escrow Agreements. *See Green River Bottling Co. v. Green River Corp.*, 997 F.2d at 362. GRC's unauthorized use of the Green River trademark is an infringement.

*Id.; Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431, 435 (7th Cir.1989). GRC's self-help, despite its contention that S-G breached the Purchase Agreement, cannot be justified. *Green River Bottling Co. v. Green River Corp.*, 997 F.2d at 362 (citing *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 282 (7th Cir.1992)).

While S-G has not provided the Court with a Rule 12(m) statement of facts, has not directed the Court to any supporting materials, or explained how the elements of its Lanham Act claim have been satisfied, the Court finds that the legal conclusions in *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359 (7th Cir.1993), support judgment for S-G. It is undisputed that GRC distributed unauthorized Green River products, falsely labeled as "original." It cannot be disputed that these mislabeled products deceived their purchasers, that the representations were material in the consuming public's purchasing decisions, that the products entered interstate commerce, or that these misrepresentations did, or were likely to, injure S-G. Given these conclusions, the Court finds that there is no genuine issue of material fact regarding GRC's violation of section 43(a) of the Lanham Act.

GRC makes no specific objection to any of the above findings. GRC does raise an objection to any finding of liability against Daniel J. Meyers individually, and also has previously objected to S-G's standing to sue under the Lanham Act. The Court now turns to each of these issues.

1. Liability for Meyers

This issue has only been briefly touched upon by the parties. The result is governed by *Southern Bell Tel. & Tel. v. Associated Tel. Directory Publishers*, 756 F.2d 801 (11th Cir.1985). That case, a copyright infringement case, states:

*7 An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement.

*Id.* at 811. Under this principle, a controlling officer or employee may be held individually liable for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 6
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

Lanham Act violations. *See General Motors Acceptance Corp. v. Synergy Corp., No. 90-C-3522, 1992 WL 77682, (N.D.Ill. April 7, 1992)* (stating that an individual defendant cannot escape Lanham Act tort liability behind the corporate veil); *Viabiotics, Inc. v. Krupka,* 606 F.Supp. 779, 785 (E.D.N.Y.1984) (holding an individual defendant jointly liable with three corporations active in marketing infringing materials). This conclusion is consistent with the language of Section 43(a), which states that any "person" shall be held liable for violations of that Act. Moreover, in its response to Plaintiff's motion, GRC has directed the Court to absolutely no contrary authority on this issue.

Given that Meyers was the controlling, if not the only, shareholder of GRC and was solely responsible for managing its activities, the Court concludes that Meyers may be held liable under the Lanham Act.

### 2. Standing

GRC contends, in previously submitted memoranda, that S-G lacks standing to sue under the Lanham Act. The Court disagrees.

Section 43(a) permits an action by "any person who believes that he or she is or is likely to be damaged" by trademark misrepresentations. The Seventh Circuit has interpreted this language to require the plaintiff to establish a "reasonable interest to be protected" in the trademark. *See Dovenmuehle v. Gilldorn Mortgage Midwest Corp.,* 871 F.2d 697, 700 (7th Cir.1989). In the opinion of the Court, S-G clearly satisfies this requirement. S-G's security interest in the mark at the time of GRC's infringement is sufficient.

### B. Relief Under the Lanham Act

### 1. Section 1117

Section 1117 permits a plaintiff who prevails under the Lanham act to recover, "subject to the principles of equity", the following: (1) the defendant's profits, (2) actual damages sustained, and (3) the costs of the action. 15 U.S.C.A. § 1117(a) (West Supp.1993). In certain circumstances, the Court may award damages in the amount of three times the greater of defendant's profits or plaintiff's actual damages. 15 U.S.C.A. § 1117(b) (West Supp.1993).

### a. Actual Damages

Plaintiff has not submitted any evidence indicating that it actually suffered damages as a result of the Defendant's misrepresentations. As to this element of damage, Plaintiff is directed to submit evidence of the same with its damages memorandum. The Court thus defers deciding this matter. If necessary, the Court will schedule a hearing to resolve this issue.

### b. Defendant's Profits

Plaintiff has failed to demonstrate to the Court that GRC earned any profits from the sale of mislabeled Green River products. This is an equitable remedy that the Court may award in appropriate circumstances. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 963 (7th Cir.1992) (stating that awards of profits are limited by "equitable considerations"). While a plaintiff need not demonstrate actual damages to be entitled to an infringer's profits, *see Burger King Corp. v. Mason,* 855 F.2d 779 (11th Cir.1988), that factor may bear on such an award. However, in the opinion of the Court, the willful violation of S-G's trademark rights, and the Manufacturing Agreement ¶ 1.a., by itself, justifies such an award. *See Gorenstein Enters. v. Quality Care-USA,* 874 F.2d at 435 (noting that the district court might have abused its discretion in failing to award equitable damages in a case of willful infringement). Since Plaintiff has failed to produce any evidence of GRC's profitability, however, the Court cannot enter judgment on this requested remedy at this time. Nor can the Court determine if an award of treble profits, under Section 1117(b), is justifiable.

**\*8** Given that neither party has expressly addressed this issue in their memoranda and that further proof as to damages is needed on other counts, the Court defers granting any judgment for profits until such profits are demonstrated. The profits, if any, may be demonstrated either in the previously mentioned memoranda on damages or at the previously mentioned hearing.

### c. Costs of Litigation, Attorneys' Fees

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 7
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

Attorneys' fees for Lanham Act litigation are only recoverable in "exceptional cases." *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d at 963. GRC's intentional infringement of S-G's trademark warrants an award of attorneys fees.

In *Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431 (7th Cir.1989),* the Seventh Circuit stated that the equitable provisions of section 1117 are properly invoked where the defendant's infringement is deliberate. *Id.* at 436. In *Gorenstein,* a franchisee continued to attempt to use a franchisor's trademark despite the termination of his franchise. Here, GRC had absolutely no right to seek concentrate from another manufacturer. First, it had clearly agreed that S-G was to be the sole Green River manufacturer. Second, even if, as GRC has contended throughout this litigation, GRC retained some rights in the escrow items and S-G breached the purchase agreement, it was not entitled to seek self-help, thereby violating its agreements with S-G. *Green River Bottling Co. v. Green River Corp.,* 997 F.2d at 362.

Furthermore, while the Court's backlog and trial schedule have been responsible for some delays, the Court notes that GRC is responsible for a number of delays in this litigation. This case was initially delayed due to GRC's "calculated risk" not to include the purported credit agreement in its original Motion for Partial Summary Judgment or in its defense of S-G's original Motion for Partial Summary Judgment. *See Sethness-Greenleaf, Inc. v. Green River Corp.,* No. 89-C-9203, tr. at 13 (N.D.Ill. July 13, 1990). Since that time, GRC has failed to file scheduled memoranda. For example, as noted in this Court's decision dated April 30, 1993, GRC failed to file reply memoranda regarding its Rule 54(b) motion and a prior motion to dismiss. *See Sethness-Greenleaf, Inc. v. Green River Corp.,* No. 89-C-9203, slip op. at 4 (N.D.Ill.1993). The delays are coupled with the fact that GRC avoided giving the deposition of Daniel J. Meyers into January 1993, a little more than three years after this action was removed to federal court. In addition, GRC delayed answering the complaint in a companion case, *Green River Bottling Corp. v. Green River Corp.,* No. 91-C-4373 (N.D.Ill.), until January of 1994, and then, under the threat of a motion for default by Green River Bottling Corporation. At GRC's request, the Court granted many extensions of time for filing pleadings,

motions, and memoranda.

Given GRC's willful infringement of S-G's trademark rights, an award of costs and attorneys' fees under Section 1117 is justified.[FN6]

### 2. Section 1118

**\*9** Plaintiff seeks an order directing defendants to "recall and deliver up for destruction all imitation Green River concentrate and its derivative products ..." (*See* Supp.Compl., Count VIII, ¶ C.) The Court has the power to grant this request under 15 U.S.C. § 1118 (1988). Like an award of profits or attorneys' fees, this is a discretionary matter to be judged on the equities.

In the opinion of the Court, S-G has failed to provide the Court with sufficient information from which the Court can determine whether the equities balance in favor of granting this relief. Several matters need be considered. S-G and GRC stipulated, on May 28, 1993, to an agreed order permitting GRC to continue to distribute a substitute Green River product provided that it removed the word "original" from the products' labels. While this stipulated agreement does not constitute a "waiver" of S-G's rights, it is an equitable factor that must be weighed against other facts. Unfortunately, S-G has not provided the Court with facts sufficient to justify the requested relief. For example, there is no submitted evidence regarding the quantity of infringing products still existing, the quantity of products produced pursuant to the May 28, agreed order, or the nature of GRC's existing means of distribution. Without any such information, the Court cannot accurately weigh the relative equities.

With respect to the relief requested under section 1118, then, ruling on Plaintiff's Motion for Summary Judgment is deferred to the written submission of damages or a hearing to be held, if necessary.

### C. Conclusion

Accordingly, with respect to Count VIII, Plaintiff's Motion is granted in part and denied in part, as indicated.

### *V. Counts IX-XI*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 8
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

### A. Count IX

In Count IX, S-G seeks recovery for GRC's alleged fraud against it, bottlers, canners, and the public. With respect to this count, S-G's motion is denied. S-G has directed the Court to insufficient evidence to demonstrate that GRC, or Meyers, defrauded S-G. While S-G may have defrauded its customers, S-G has not demonstrated that is has standing to sue for those parties.

### B. Count X

In Count X, S-G claims that GRC breached paragraph 1.a. of the Manufacturing Agreement. That paragraphs states:

Green River hereby grants to S-G the exclusive right to manufacture the Product during the term hereof in accordance with the conditions hereinafter expressed.

(Manufacturing Agreement, ¶ 1.a.) GRC violated that agreement by obtaining a substitute concentrate from another manufacturer without S-G's consent. Accordingly, with respect to GRC, on Count IX, S-G's motion is granted. Daniel Meyers, as an individual, was not a party to that contract. With respect to him, the motion is denied.

### C. Count XI

In Count XI, S-G seeks an accounting from Defendants and also seeks the imposition of a constructive trust. This Count is unopposed by GRC. Accordingly, with respect to Count XI, Plaintiff's motion is granted. However, with respect to the damages to be ascertained, a hearing may be required, as indicated in the Court's discussion of Lanham Act remedies. *See* Section IV.B.1.b., *infra*.

*VI. Plaintiff's Motion for Summary Judgment on the Defendants' Counterclaims and Third Party Claims*

**\*10** Plaintiff moves for summary judgment on GRC's first nine counts constituting counterclaims and third party claims. GRC has not contested the motion. Accordingly, Plaintiff's Motion is granted.

*VII. Plaintiff's Motion to Dismiss*

Plaintiff has moved to dismiss each of the Defendants' counterclaims and third party claims asserted in Defendants' Supplemental Counterclaim and Third Party Claims. Defendants have filed no response to this motion and make no mention of it in their Response to Plaintiff's Motion for Summary Judgment. For this reason, and for the following reasons, the Motion is granted.

### A. Defendants' Count X

Count X attempts to allege an action for fraud against McRaith and S-G, asserting that McRaith and S-G engaged in a scheme to "encourage Green River to build up a sizeable account balance." Under Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must make its allegations of fraud with particularity. To satisfy the particularity requirements of Rule 9(b), a plaintiff must "describe the time, place, particular contents of the false representations, the identity of the party making the misrepresentations and the consequences of the alleged fraud." *Midwest Grinding Co. v. Spitz*, 716 F.Supp. 1087, 1092 (N.D.Ill.1989). As pleaded, Count X fails to satisfy these requirements and is dismissed.

### B. Defendants' Count XI

Count XI attempts to allege a cause of action for defamation. A complaint for defamation must state the precise language said to be defamatory. *Vantassell-Matin v. Nelson*, 741 F.Supp. 698, 707 (N.D.Ill.1990). Defendants' Count XI fails to notify the Plaintiff of the specific statements made and fails to state when, and to whom, the defamatory statements were made.

Accordingly, Count XI is dismissed.

### C. Defendants' Count XII

Count XII attempts to allege an action for tortious interference with a contract. Count XII states that McRaith, through his attorney, threatened to sue several GRC customers if they did not sign an affidavit detailing the customers' purchase of Green River products from GRC. The Count makes no allegations that S-G or McRaith intentionally and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 9
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

unjustifiably induced the breach of a contract between Defendants and some third party. Such allegations are necessary to state a claim for tortious interference. *See, e.g., Wheel Masters, Inc. v. Jiffy Metal Prods. Co.,* 955 F.2d 1126, 1129 (7th Cir.1992) (stating elements of tortious interference claim).

Accordingly, Count XII is dismissed.

D. Conclusion

For the foregoing reasons, S-G's and McRaith's Motion to Dismiss is granted.

*VIII. First Bank of Olney's Petition for Attorneys' Fees*

The Bank requests $8,796.83 in attorneys' fees pursuant to its Counterclaim. The Counterclaim seeks reimbursement under Paragraph 13 of the Escrow Agreement wherein S-G and GRC agreed to reimburse the Bank for reasonable expenses, including attorneys' fees, incurred in litigation pertaining to its duties as escrow agent.[FN7] S-G opposes $6,945.01 of the fees requested.

*11 In particular, S-G disputes fees incurred by the Bank in telephone conferences between several attorneys said to discuss "open issues" and "courses of action", fees incurred researching jurisdictional issues, fees for the review of pleadings, motions, and petitions, fees for court appearances, fees incurred preparing a paragraph in pretrial scheduling order, fees for time spent relating to the Bank's fees, and several costs. In the opinion of the Court, some of the expenses noted by S-G are unnecessary.

While it is difficult for the Court to estimate reasonable fees with precision, and while S-G has only listed the fees to which it objects, the Court finds that the following fees should be disallowed.

The Court agrees that the Bank need not have spent the time it did discussing "open issues" or "courses of action". The $419.00 so expended should be deducted from the requested fee. In addition, the jurisdictional issue in this case, the Defendants' removal, was not difficult and should not have concerned the Bank. The $222.00 expended on that

issue should also be deducted. Furthermore, the Court informed the Bank's counsel, on several occasions, that his appearance in Court was unnecessary unless he was specifically requested. The Bank's counsel continued to appear, however. The Court finds that the $1,356.75 of Court time pointed out by S-G should be disallowed.

In the opinion of the Court, the remainder of the fees requested are reasonable given the length of this litigation and the duties of the Bank's attorneys. Accordingly, the Bank's Petition for attorneys' fees is granted in part. Of the $8,796.83 requested, the Court disallows $1,997.75, and permits an award of $6,799.08 against both S-G and GRC, joint and several in accordance with the Escrow Agreement between the parties. However, GRC will be liable to S-G for S-G's share of the fees.

S-G argues that, despite the fact that paragraph 13 of the Escrow agreement provides that S-G and GRC split the Bank's attorneys' fees, GRC should be required to indemnify S-G for S-G's half of the fees. The Court agrees. Under the indemnity provision of the Purchase Agreement, Chapter IX, Section 9.1, GRC is liable to S-G for litigation costs. The Bank's fees are one such cost.

CONCLUSION

*12 Plaintiff's Motions are granted in part, as indicated. Plaintiff shall file a memorandum setting forth the factual and legal issues supporting its claim for damages within fourteen days of the date of this order. Defendants shall respond within seven days thereafter. If necessary, the Court shall set an evidentiary hearing date to take further evidence with respect to S-G's actual damages and any remaining issues. A final judgment, reflecting the Memorandum Opinions and Orders herein, will thereupon be entered so that a final appeal can be taken to conclude this protracted litigation.

FN1. The Complaint was titled: Verified Complaint for Declaratory Judgment, Permanent Injunction, Breach of Contracts and Other Relief.

FN2. This amendment was titled: Amendment to Verified Complaint for Declaratory Judgment, Permanent

Not Reported in F.Supp.                                                                          Page 10
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615
**(Cite as: Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.))**

Injunction, Breach of Contracts and Other Relief.

FN3. The supplement was titled: Supplemental Verified Complaint for Temporary Restraining Order, Permanent Injunction, Violation of 15 U.S.C. § 1125, Breach of Contract, Fraud, and Other Relief.

FN4. S-G has not provided the Court with any authority justifying its retention of these payments.

FN5. The Court notes, however, that *Green River Bottling Co. v. Green River Corp., 997 F.2d 359 (7th Cir.1993)*, by reason of the record, is limited in the factual determinations that can be relied upon.

FN6. For the record, the Court notes that all of the delay in this case is not attributable to GRC or the Court. In particular, S-G's failure to properly address issues, including several of those presented in this motion, has delayed and continues to delay the entry of judgment.

FN7. This request is consistent with the Bank's Counterclaim pleading its right to attorneys' fees and with a previous motion seeking the inclusion of language providing for its reimbursement in a judgment order.

N.D.Ill.,1994.
Sethness-Greenleaf, Inc. v. Green River Corp.
Not Reported in F.Supp., 1994 WL 67830 (N.D.Ill.), 1994-1 Trade Cases P 70,615

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))**

**H**Sparks Tune-Up Centers, Inc. v. Panchevre
N.D.Ill.,1992.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
SPARKS TUNE-UP CENTERS, INC., Plaintiff,
v.
Samuel L. PANCHEVRE, Maricela Panchevre, Fred
Hobbs, Individually, Alamo City Investments, and C
& H Corporation, Defendants.
**No. 90 C 4369.**


Aug. 21, 1992.


MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.
**\*1** Plaintiff Sparks Tune-Up Centers, Inc. ("Sparks")
has brought this action against defendants Samuel
and Maricela Panchevre (the "Panchevres") and Fred
Hobbs ("Hobbs"), alleging trademark infringement
and unfair competition. Specifically, Sparks claims
that the Panchevres and Hobbs opened and operated a
Sparks tune-up center without a valid franchise
license. This case is before the court on plaintiff's
motion for summary judgment on Counts I, II and IV
of plaintiff's First Amended Complaint and on Counts
I and II of defendant's counterclaim, as well as
defendants' motion to dismiss plaintiff's motion for
summary judgment.[FN1] For the reasons stated below,
plaintiff's motion for summary judgment is granted.


*Background*

Sparks is a national franchisor of automotive centers
which are run under a standard, unique and uniform
system developed by Sparks. Sparks has federally
registered proprietary service marks and trademarks
for computerized automotive tune-up services and for
rendering technical aid and assistance in the
establishment and/or operation of automotive
maintenance and repair shops. At the time this cause
of action arose, Sparks had approximately 135
franchisees nationwide.

On July 31, 1989, Samuel Panchevre and Hobbs met
with Sparks' director of franchise sales to discuss
obtaining a Sparks franchise to be operated at
Castleton Mall in Indianapolis, Indiana. Defendants
represented themselves as partners of a company
called Alamo City Investments ("Alamo").[FN2] At the
meeting, defendants received a copy of the Sparks
Uniform Franchise Offering Circular which
contained, among other things, a complete copy of
the Franchise Agreement ("Agreement"). On
November 9, 1989 Samuel Panchevre and his wife
Maricela personally executed the Agreement and
other related documents, and paid $5000 toward the
required $20,000 initial franchise fee.

Between November 1989 and March 1990,
Panchevre and Hobbs took steps to open their
franchise by ordering equipment, overseeing
leasehold improvements on the franchise site, and
hiring Walter Rogers ("Rogers") to be their on-site
manager. Rogers was sent to the Sparks training class
in Downers Grove, Illinois after Panchevre promised
Sparks that the remaining balance of the franchise
fee, as well as the required advertising fee, would be
paid. When these fees were not paid and other
conditions precedent to the granting of a Sparks
franchise were not met, Sparks informed Panchevre
and Hobbs that they would not receive a Sparks
franchise license.

Despite warnings by Sparks that they were not
authorized to open a Sparks franchise, defendants
opened a Sparks Tune-Up Center in Indianapolis on
March 24, 1990. In July 1990, defendants changed
the exterior signs on the shop to "Alamo Brake &
Tune." Thereafter, Sparks sought a temporary
restraining order ("TRO") to prevent defendants and
their agents from continuing to use the Sparks
trademark. After this court issued the TRO on August
2, 1990, defendants' shop was closed.


*Plaintiff's Motion for Summary Judgment*

**\*2**Federal Rule of Civil Procedure 56(c) provides that
summary judgment is appropriate "if the pleading,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 2
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))**

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment bears the initial burden of informing the court of the basis of its motion and identifying those portions of the record which demonstrate that there is no genuine issue of material fact. _Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986)._ In responding to a properly supported motion for summary judgment, a nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." _Anderson v. Liberty Lobby, 477 U.S. 242, 256, 106 S.Ct. 2505, 2510 (1986)._ When reviewing such a motion, a court is required to take the nonmoving party's evidence as true and draw all justifiable inferences in the nonmoving party's favor. _Id. at 255, 106 S.Ct. at 2513._ In addition, where, as here, defendants are proceeding pro se, defendants are not held to stringent standards of formally trained attorneys and their pleadings are to be liberally construed. _Jamison-Bey v. Thieret, 867 F.2d 1046, 1047 (7th Cir.1989)_ (citing _Caldwell v. Miller, 790 F.2d 589, 595 (7th Cir.1986))._

In the present case, plaintiff seeks summary judgment on Counts I, II, and IV of its First Amended Complaint, and Counts I and II of the defendants' Counterclaim. In Count I of plaintiff's amended complaint, Sparks seeks a declaratory judgment against the Panchevres, finding that they were never licensed as Sparks franchisees.[FN3] Plaintiff contends that the Panchevres are not licensed as franchisees because they failed to fulfill the conditions precedent to the issuance of a franchise license. The Franchise Agreement entered into by the Panchevres and Sparks contained very specific requirements for the granting of a franchise license. According to Paragraph 1.3 of the Agreement, defendants were required to: (a) open an automotive center at an approved site, (b) give Sparks a certificate of insurance explaining the types and limits of coverage under the policy and listing Sparks, Sparks' parent, PIC and GKN North America as additional insureds, and (c) successfully complete the required training. Paragraph 1.5 also required defendants to pay an initial franchise fee of $20,000 payable in two installments.[FN4] Finally, under Paragraph 1.6, defendants were required to pay Sparks an initial advertising fee of $8000 sixty days prior to the scheduled opening of the center. _See_ Plaintiff's Joint

Response to Defendants' Motion in Opposition, Exhibit A.

Plaintiff contends that because the Panchevres did not submit the required certificate of insurance, they were not licensed as Sparks franchisees. Plaintiff's claim is supported by the affidavit of Joan M. Koeck ("Koeck"), a Sparks dealer development coordinator. In her affidavit, Koeck states that the Panchevres did not provide the requisite insurance certificate prior to opening as required by the Franchise Agreement. The Panchevres opened for business in March 1990, but their insurance certificate was not received until June 1990. Koeck further states that the insurance certificate which was eventually received by Sparks did not comply with the requirements of the Agreement. _See_ Plaintiff's Motion for Summary Judgment, Exhibit A. Plaintiff also claims that defendants were not licensed franchisees because they did not pay the majority of the initial franchise fee or the advertising fee. This claim is properly supported by the affidavit of Celia Davis ("Davis"), Sparks' Accounting Manager. In her affidavit, Davis states that the Panchevres failed to pay the initial $8000 advertising fee and only paid $5000 of the initial $20,000 franchise fee. _See_ Plaintiff's Motion for Summary Judgment, Exhibit B.

**\*3** Defendants do not deny that they entered into the Franchise Agreement or that they were not licensed as franchisees. Indeed, in Paragraphs 11 and 13 of their answer and counterclaim to plaintiff's First Amended Complaint, they admit that they never obtained a franchise license. _See_ Plaintiff's Motion for Judgment on the Pleading, Exhibit B. Defendants instead argue that they entered into the Agreement based upon plaintiff's fraudulent misrepresentation that unless defendants signed the Agreement in their individual capacity, "[p]laintiff would take away the right to the franchise."[FN5] Defendants further argue that Maricela Panchevre was induced to sign the Agreement without being permitted to read the document or having the opportunity to have an attorney examine it. In other words, defendants claim that they were forced to sign the Agreement under coercion or economic duress.

Duress has been defined as including the imposition, oppression, undue influence or the taking of undue advantage of the business or financial stress of another, whereby his free will is overcome.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))

*Continental Illinois National Bank v. Stanley,* 606 F.Supp. 558, 562 (N.D.Ill.1985). In order to invalidate an agreement based upon duress, a party must show that he was induced to execute a contract by a wrongful act or threat under circumstances which deprived him of the exercise of his free will. *Id.*

This court finds that, even construing defendants' arguments liberally as is required with pro se litigants, defendants' duress and coercion claims are not supported by the evidence. Defendants seem to suggest that the duress in this case resulted from their being required to sign a contract in order to receive the pertinent franchise license. This argument is frivolous. Parties are free to contract as they see fit. The fact that a Sparks franchise license is conditioned upon the signing of a Franchise Agreement does not constitute duress or fraud. Further, the Panchevres incurred no obligations until they executed the Agreement. Therefore, defendants cannot claim that they were forced to sign the document because of any action taken as a prerequisite to the obtaining of a license.

Moreover, there is no evidence suggesting that Sparks forced defendants to sign the Agreement without first giving them the opportunity to review it. Ralph Loberger ("Loberger"), Director of Franchise Sales for Sparks at the time of this action, handled the transaction with Samuel and Maricela Panchevre. In his sworn affidavit, Loberger states that the Panchevres received a copy of the Franchise Agreement at their first meeting on July 31, 1989, approximately three months before the Agreement was actually signed. Loberger further states in his affidavit that the Panchevres never requested a continuance or that an attorney be present, and that the entire meeting was very relaxed. *See* Memorandum of Law in Support of Plaintiff's Joint Response to Defendants' Motion in Opposition, Exhibit A. Therefore, defendants were never deprived of legal representation nor were they deprived of the opportunity to have the document reviewed as they suggest.

**\*4** Similarly, there is no evidence suggesting that plaintiff fraudulently misrepresented that unless defendants signed the Agreement in their individual capacity, defendants could not obtain a Sparks franchise. In his affidavit, Loberger states that it is

Sparks policy to have individuals, rather than corporations, execute Franchise Agreements, and that if a person requesting a franchise is married, corporate policy requires that the spouse also execute the agreement. According to Loberger, this policy is intended to eliminate the possibility of fraudulent conveyances. The fact that a Sparks franchise license is conditioned upon potential franchisees signing a Franchise Agreement in their individual capacity does not constitute duress or fraud. As previously explained, parties are free to contract as they see fit. The Panchevres were under no obligation to sign the Franchise Agreement in their individual capacities. And, since they incurred no obligations prior to signing the Franchise Agreement, defendants could have opted not to enter into an agreement with Sparks. This court is not persuaded by defendants' allegations that they were fraudulently induced to sign the Agreement.

In sum, defendants have offered no evidence to refute Loberger's testimony nor to support their claims of coercion, duress, or fraudulent misrepresentation. Defendants' claims, without the support of affidavits or other evidence, do not suffice to avoid a motion for summary judgment. *See Continental Illinois National Bank,* 606 F.2d 558. Plaintiff adequately demonstrates, and defendants do not refute, that they did not fulfill the requirements of the Franchise Agreement and that a franchise license was never granted. Since there is no genuine dispute regarding the fact that Samuel and Maricela Panchevre were not Sparks franchisees, this court grants plaintiff's motion for summary judgment on Count I.

Plaintiff also seeks summary judgment on Count II of its amended complaint. In Count II, plaintiff seeks judgment against Samuel and Maricela Panchevre for trademark infringement and unfair competition based upon their unauthorized opening and operation of a Sparks automotive center without a franchise license. Plaintiff argues that defendants have violated the Trademark Laws of the United States ("Lanham Act"), 15 U.S.C. § 1051, *et seq.*

The Lanham Act states that any person who shall, without the consent of the owner of the trademark:

[U]se in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a). According to the Seventh Circuit, the purpose of a trademark is to identify the good or service to consumers. A trademark creates a duty that the registrant ensure the consistency of the trademarked good or service. *Gorenstein Enterprises v. Quality Care-USA, 874 F.2d 431, 435 (7th Cir.1989).* The Seventh Circuit has also stated that when the owner of the trademark breaks off business relations with a licensee, he cannot insure the continued quality of the ex-licensee's operation. Therefore, the ex-licensee's continued use of the trademark is considered a violation of trademark law. *Id.* It is also well established that "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement." *Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (7th Cir.1983)* (citing *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co., 514 F.2d 665, 670 (5th Cir.1975)).* Once it is established that a trademark has been used without the owner's consent, a party claiming trademark infringement need only show that the trademarks were employed in a manner that was likely to cause confusion, cause mistakes or to deceive. *Burger King Corp., 710 F.2d at 1492.*

**\*5** Plaintiff argues that the Panchevres opened and operated a Sparks shop without Sparks' consent, and that this was done in a manner which was likely to confuse or deceive the public in violation of the Lanham Act. This court has already determined that the Panchevres were not legally entitled to use the Sparks name because they were not licensed as Sparks franchisees. The remaining question is whether defendants' opening and operation of a Sparks automotive center was done in a manner likely to confuse or lead the public to believe that the automotive shop in Indianapolis was a licensed Sparks franchise. Plaintiff argues that defendants encouraged the public to believe that their shop was operating as an authorized Sparks automotive center by using the Sparks name. Plaintiff also asserts that since defendants were not operating under a valid Sparks franchise agreement, plaintiff was unable to supervise, inspect or police defendants' shop to ensure that approved procedures were being

employed and quality service was being provided to the public. Therefore, plaintiff argues, Sparks was unable to protect its good name and overall reputation with consumers.

Plaintiff has provided this court with ample evidence to support its claim. For example, plaintiff submits the deposition of Walter Rogers, the manager of defendants' shop, to support its claim that the Panchevres opened and operated the Indianapolis shop as a Sparks Tune-up Center. Based upon a review of the shop's work orders and invoices, Rogers confirms that the Panchevres' store opened under the Sparks name on March 24, 1990. (Deposition of Walter Rogers at 53.) Rogers further states in his affidavit that he placed advertisements for the Panchevres' shop in *The Indianapolis Star,* and that these ads ran from March 31, 1990 through May 30, 1990. These advertisements used the Sparks name and logo, and offered special prices on certain car services. The ads also mentioned the Sparks "Triple Guarantee," and gave the address of the defendants' shop at the Castleton Mall. (Deposition of Samuel Panchevre, Exhibit 71.) Plaintiff's claim that the store in Indianapolis was opened and operated under the Sparks name is further supported by the deposition of Samuel Panchevre himself. Panchevre admits that the store was opened on March 24, 1990 under the Sparks name, and he also concedes that the Sparks name was being used at the shop as late as August, 1990. (Deposition of Samuel Panchevre at 196-207.) Finally, plaintiff supports its claim that the Indianapolis shop was operating under the Sparks name as late as August, 1990 with the deposition of Steven Halbert ("Halbert"). Halbert states that on August 6, 1990, he received a work order/invoice for an oil change prominently displaying the service mark "Sparks Computerized Car Care," as well as an estimate form and a promotional litter bag also displaying the Sparks logo. *See* Plaintiff's Motion for Summary Judgment, Exhibit D. Based upon this evidence that the Panchevres opened and operated the Indianapolis store under the Sparks name, plaintiff argues that its trademark has been violated. Since the public had no way of knowing that the shop was not actually licensed as a Sparks franchise, they were made to believe that they were dealing with a fully licensed Sparks dealership, when in reality, they were not. A customer receiving poor service, plaintiff argues, would immediately attribute the problem to other, fully licensed Sparks shops, while Sparks remained unable to police or inspect the Panchevres'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))

store.

*6 Defendants do not assert that plaintiff has misstated the applicable law or provide this court with evidence demonstrating that the shop was not opened and operated as a Sparks center. Defendants also do not offer any evidence to contradict the evidence submitted by plaintiff. Instead, defendants argue that they cannot be held liable because they were not personally involved in the opening or the operation of the shop. They contend that the shop was opened and maintained by Alamo and that they sold their interest in Alamo before Sparks began complaining about the unauthorized use of its trademarks.

This court is not persuaded by defendants' wholly unsupported arguments. Samuel and Maricela personally executed the Franchise Agreement with Sparks on November 9, 1989. Defendants have provided this court with no evidence showing that this Agreement was assigned or transferred to another party prior to the opening of the automotive center. Indeed, Panchevre concedes in his deposition that Alamo's records indicate that defendants did not transfer his interest in the corporation until June 19, 1990, more than three months after the shop had been open. (Deposition of Samuel Panchevre at 208-210.) In his deposition, Panchevre also admits receiving a letter dated March 28, 1990 from James Lentz, Sparks' Vice President, informing him that he had failed to meet the pre-opening requirements to become a Sparks franchisee. (Deposition of Samuel Panchevre at 196-197.) Defendant did not state that the letter should have been directed to another party and, in fact, Panchevre admits to responding to the letter with his own letter dated April 26, 1990, requesting that a meeting be held between himself and Sparks to resolve the matter. (Deposition of Samuel Panchevre at 198-199.) Moreover, store manager Rogers states in his deposition that he was hired by Samuel Panchevre to manage the automotive center. (Deposition of Walter Rogers at 12-18.) Thus, the evidence presented clearly contradicts defendants' claim that they were not involved in the opening or operation of a Sparks shop.

Defendants' claim that they are shielded from liability by their status as officers of Alamo is also unpersuasive. It is well established that a corporate officer is individually liable for the torts he

personally commits. He cannot shield himself behind a corporation when he is an actual participant in the tort. *See, e.g., Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3rd Cir.1978), *Solo Cup Company v. Paper Machinery Corp.,* 359 F.2d 754, 760 (7th Cir1966). Indeed, it has been held that a corporate officer is individually liable for trademark infringement when he "performs the act or does the things that the patent or trademark law protects against." *Mead Johnson and Company v. Babies Formula Service, Inc.,* 402 F.2d 19, 23 (5th Cir.1968). *See also Brandywine Mushroom Co. v. Hockessin Mushroom Products, Inc.,* 682 F.Supp. 1307 (D.Del.1988), *Polo Fashions, Inc. v. Branded Apparel Merchandising, Inc.,* 592 F.Supp. 648 (D.Mass.1984). Thus, even if defendants acted as officers of Alamo, they are liable for their unauthorized use of the Sparks trademark. The mere fact that they were officers of a corporation cannot shield the Panchevres from liability for their unlawful infringement of Sparks' trademarks. Accordingly, the court grants plaintiff's motion for summary judgment on Count II of plaintiff's First Amended Complaint.

*7 Plaintiff next moves for summary judgment on Count IV of the Complaint. In Count IV, Sparks seeks judgment against Hobbs for his conduct in opening and operating the Sparks shop without authorization. Plaintiff contends that the evidence clearly demonstrates that Hobbs knowingly operated the Sparks center with out a franchise license. For example, Hobbs admits his role in operating the shop in the answer and counterclaim filed jointly by all three defendants. In his answer, Hobbs does not deny that he hired Rogers to manage the shop. Hobbs also admits that from November 1989 to March 1990, he was involved in and was instrumental in preparing for the opening of the Sparks center. Hobbs further admits having personal knowledge of the Franchise Agreement entered into by the Panchevres, and the terms of that Agreement. *See* Defendants' Answer and Counterclaim to First Amended Complaint at ¶ IV.

Plaintiff also relies on Hobbs' deposition in which he states that in March, 1990, when the shop opened, he knew that the Panchevres had not met all the requirements for receiving a franchise license. Hobbs also admits that he removed the Sparks sign after being contacted by Sparks and told to cease operations as a Sparks store. (Deposition of Fred Hobbs at 51.) Plaintiff also relies on Roger's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 6
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))**

deposition in which he states that Hobbs continued to use the Sparks name on warranties, work orders and invoices even after the exterior sign was changed to read "Alamo Brake and Tune." Rogers states that Hobbs told him to continue using the forms "until they are gone." (Deposition of Walter Rogers at 73-77.) Plaintiff contends that this evidence clearly demonstrates that Hobbs knowingly opened and operated a Sparks center without a franchise license in violation of the trademark laws.

Hobbs' response to Sparks' claim is similar to that offered by the Panchevres. Hobbs does not argue that the applicable law has been misstated or that the shop was never operated as a Sparks store. Instead, he insists that he is not liable because he was not personally involved in the business. Hobbs states that it was Alamo, of which he became an officer in February, 1990, who was actually involved in the operation of the shop. Hobbs argues that his actions were merely undertaken on behalf of Alamo or the C & H Corporation. Therefore, Hobbs argues, he only hired Rogers and assisted in the opening of the Sparks' shop in his capacity as an officer of Alamo. Defendant further argues that when Rogers testified in his deposition, he did so "out of context", knowing that Alamo, and not Hobbs, was the owner and operator of the shop.

Like the Panchevres, however, Hobbs provides no evidence whatsoever to support his claims. Moreover, defendant has provided no evidence to the court to contradict or discredit Roger's sworn testimony. Roger's testimony clearly demonstrates that Hobbs was personally involved and, indeed, instrumental in the opening and operation of the Indianapolis shop. In the absence of proof from the nonmoving party, the evidence of the moving party is to be accepted as true. *See Kaszuk v. Bakery and Confectionary Union, 791 F.2d 548, 558 (7th Cir.1986)* (citing *Wang v. Lake Maxinhall Estates, Inc., 531 F.2d 832, 835 n. 10 (7th Cir.1976).* Therefore, the court has no choice but to rely upon plaintiff's evidence of Hobbs' personal involvement with the shop.

***8** Further, as stated previously, a corporate officer cannot use the corporate entity as a shield, but is personally liable for the torts he commits. *See eg. Donsco, Inc. v. Casper Corp., 587 F.2d at 606. Solo Cup Company v. Paper Machinery Corp., 359 F.2d at*

760. Therefore, even if the court accept Hobbs' assertations that he participated in the opening and operation of the Sparks shop as an officer of Alamo, that fact does not excuse Hobbs' own tortious conduct. Since the evidence shows that Hobbs was intricately involved in the opening and operation of the Sparks store without authorization to use the Sparks trademark, this court finds that Hobbs is liable for trademark infringement and unfair competition. Therefore, plaintiff's motion for summary judgment on Count IV is granted.

Plaintiff further seeks summary judgment on Count I of defendants Panchevres' counterclaim. In Count I of the Counterclaim, the Panchevres assert that they are entitled to a refund of their $5,000 down payment on the initial franchise fee from Sparks because they were never licensed as franchisees. The Panchevres further contend that they are entitled to $50,000 per year for the fifteen year term of the Franchise Agreement because Sparks represented to them that a Sparks franchise would have a minimum net income of $50,000 per year. Plaintiff contends that it is entitled to summary judgment on this claim because it was defendants who were responsible for their failure to obtain a franchise license. According to plaintiff, the Panchevres cannot claim that the Agreement was breached because they never performed their obligations under the Agreement, and hence the contact was never operational. In the alternative, Sparks argues that even if the contract had gone into effect, it was defendants and not plaintiff who breached the contract. Therefore, plaintiff argues, the Panchevres are in no position to demand a refund.

This court agrees with plaintiff that the Panchevres have no contractual remedy in this case, and that the defendants cannot request a refund based upon a contract which was never fully performed. Because all the conditions precedent were not met by the Panchevres, there was no contract. The court is equally convinced that even if this contract had gone into effect, the Panchevres breached the Agreement by failing to comply with its conditions. Therefore, as plaintiff suggests, they have no right to a refund. Moreover, the contract itself provides no right to a refund for any of the parties.

Defendants contend that they are entitled to a refund under a letter written by Sparks on May 14, 1990. In

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                 Page 7
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))**

this letter, Sparks offered to refund the $5000 payment if the Panchevres immediately removed any and all Sparks identification from the exterior and interior of the Indianapolis store. Defendants suggest that this letter created a legal obligation on the part of Sparks to refund their money. This court disagrees. While this court recognizes that this offer was made by Sparks, the court finds that Sparks' offer to refund the money was not made pursuant to any contractual obligation. Moreover, it was conditioned upon the removal of "any and all Sparks identification from both the interior and exterior of the building." Indeed, the letter stated that a refund would only be sent after Sparks received photographs evidencing the absence of Sparks identification in and around the shop. Deposition of Samuel Panchevre, Exhibit 68.

**\*9** This court has previously determined that the Sparks name was being used at the Panchevres' shop as late as August, 1990. Thus, the Panchevres clearly failed to meet the requirements of the May 14, 1990 letter. Therefore, plaintiff was free to rescind its offer. Defendants have failed to provide this court with any evidence to the contrary. Therefore, this court finds that Sparks' letter did not create a legal obligation on the part of Sparks to refund the Panchevre's down payment.

This court also finds that defendants' claim that they are entitled to receive $50,000 per year for the full fifteen year term of the franchise agreement is without merit. According to Loberger, the Sparks representative who handled the execution of the Franchise Agreement, Sparks never represented to the Panchevres that they would have a guaranteed income of $50,000 per year. *See* Plaintiff's Motion for Summary Judgment, Exhibit E. The fact that Sparks never made such representations is further evidenced by the fact that Samuel Panchevre signed Business Risk Acknowledgment Statements (the "Statements") on two separate occasions. By signing these Statements, Panchevre acknowledged that he had not received any information regarding actual, average, projected or forecasted franchise sales profits or earnings. (Deposition of Samuel Panchevre, Exhibit 11.) Moreover, the Agreement signed by the Panchevres and Sparks never suggested that Sparks would pay the Panchevres any amount for expected profits that are not reached. *See* Plaintiff's Joint Response to Defendants' Motion in Opposition, Exhibit A. Thus, there is no contractual basis for the

Panchevres' claim. Accordingly, the court finds that the Panchevres are not entitled to receive $50,000 per year for 15 years from Sparks for lost projected earnings. Plaintiff's motion for summary judgment on Count I of the defendants' Counterclaim is granted.

Finally, plaintiff seeks summary judgment on Count II of defendants' Counterclaim. In Count II of their Counterclaim, defendants allege that Sparks committed fraud because it did not provide defendants with a sublease for their automotive center. The Panchevres contend that Sparks never told them that a lease did not exist for the Castleton Mall location, and that because of their inability to obtain a lease, defendants were unable to obtain adequate financing. Defendants allege that Sparks did not inform them of the fact that negotiating a lease would be their responsibility because Sparks never intended to license the Panchevres as franchisees.

This court agrees with plaintiff that defendants' claim is not supported by the evidence. Sparks has submitted copies of two letters it sent to Samuel Panchevre dated October 11, 1989 and October 25, 1989, which demonstrate that Panchevre knew that Sparks did not have a lease for the Castleton Mall property with the landlord, Eastline. (Deposition of Samuel Panchevre, Exhibits 16 and 24.) Indeed, in the letter of October 25, 1989, Sparks advised Panchevre to negotiate a lease directly with Eastline. (Deposition of Samuel Panchevre, Exhibit 24.) In addition, the Franchise Agreement clearly states that it is the franchisees' obligation to obtain a lease for its franchise. *See* Plaintiff's Joint Response to Defendants' Motion in Opposition, Exhibit A at § 5.1.

**\*10** Once again, defendants do not submit any evidence to support their claims or to contradict Sparks' evidence. Therefore, this court accepts the evidence of the plaintiff as true and finds that defendants were adequately informed that they were responsible for obtaining a lease for their franchise. Since no evidence of fraud has been provided to this court, plaintiff's motion for summary judgment on Count II of defendants' Counterclaim is granted.

*Plaintiff's Motion for Judgment on the Pleadings*

Plaintiff Sparks moves for judgment on the pleadings against Maricela Panchevre on Counts VII, IX and X of the First Amended Complaint, and against Samuel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.))

Page 8

Panchevre on Count IX of the First Amended Complaint.[FN6] Plaintiff argues that defendants' failure to answer with respect to these counts constitutes an admission of liability.

Defendants counter that their failure to deny the disputed counts was not intended as an admission of liability. Rather, it was merely an oversight or a typographical error. Since defendants are proceeding pro se, this court finds that defendants' failure to deny these counts was inadvertent and not intended to constitute an admission. Accordingly, the court will excuse defendants' error and deny plaintiff's motion for judgment on the pleadings. Defendants are ordered to file an amended answer by September 7, 1992.

*Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment as to Counts I, II and IV of the First Amended Complaint and as to Counts I and II of the defendants' Counterclaim is granted. Plaintiff's motion to dismiss Counts VII, IX and X of the First Amended Complaint is denied. Defendants are order to file an amended answer by September 7, 1992.

> FN1. Defendants, in their response to the Motion for Summary Judgment, move to dismiss plaintiff's motion for summary judgment. Since such a motion is procedurally incorrect, this court has merely considered the arguments in favor of this motion as part of the defendants' response to plaintiff's Motion for Summary Judgment.

> FN2. Alamo had not been legally established as of the time of this meeting, but was subsequently incorporated on November 1, 1989 with Samuel Panchevre as its sole shareholder and director. Hobbs became an Alamo officer in February, 1990. This court entered a default judgment against Alamo on or about May 21, 1991 when it failed to answer or otherwise plead to the First Amended Complaint within thirty days after having been served with a summons.

> FN3. Plaintiff also requests in Count I that defendants be ordered to stop identifying

their business as a Sparks Tune Up Center and discontinue their use of the Sparks name. Because defendants' business has been shut down as a result of the August 2, 199 TRO entered in this case, this portion of Count I need not be considered.

> FN4. The first payment of $5000 was to be paid when the potential franchisee signs the franchise agreement. The second payment of $15,000 was due upon final review and execution of the agreement, or upon the first day of training, whichever is later.

> FN5. Defendants' Motion in Opposition to Plaintiff's Motion for Summary Judgment at ¶ 1.4.

> FN6. Count VII of the amended complaint alleges theft of trade secrets. Count IX, that defendants were unjustly enriched and that the defendants should be considered constructive trustees of Sparks' confidential information and trade secrets. Finally, Count X alleges conversion of Sparks' confidential information, trade secrets, and proprietary materials by defendants.

N.D.Ill.,1992.
Sparks Tune-Up Centers, Inc. v. Panchevre
Not Reported in F.Supp., 1992 WL 211029 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------x

C.S.B. COMMODITIES, INC.,

               Plaintiff,

        v.

URBAN TREND (HK) LTD., AND ROBERT KUSHNER,

              Defendants.

-------------------------------------------------------------x

Civil Action No. 1:08-cv-01548

Judge Robert M. Dow, Jr.
Magistrate Judge Morton Denlow

DECLARATION OF ROBERT
SCHMEIZER

## DECLARATION OF ROBERT SCHMEIZER

The undersigned, Robert Schmeizer, hereby declares as follows:

1.    I am president of Plaintiff, C.S.B. Commodities, Inc. ("CSB"), and I submit this Declaration in Opposition to the motions made by the defendants, Urban Trend (HK) Ltd. ("Urban Trend") and Mr. Robert Kushner ("Kushner"), for dismissal of the Amended Complaint for lack of personal jurisdiction and by Kushner for dismissal of the Amended Complaint for failure to state a claim.

2.    I make the following statements with the knowledge that false statements are punishable as perjury.

3.    The following statements are true to my own knowledge, except for those statements made "upon information and belief", which statements are believed to be true after an investigation into the facts so stated and with the belief that the facts are true.

4.    C.S.B. is a New York corporation engaged in the business of selling housewares. One of C.S.B.'s products is a knife holder with a distinctive shape, namely that of a

human figure leaning slightly backwards, with knife slots positioned throughout the figure's "body" (a photograph of C.S.B.'s product is Exh. A to the Amended Complaint; hereinafter "Am. Comp.").

5.      Upon information and belief, the falling down figure has acquired distinctiveness as an indicator identifying the origin of knife holders offered for sale in that configuration. The figure has even become known among the purchasing and business community as "the little red man" (see, *e.g.*, Am. Comp. Exh. D, copies of blogs mentioning the "little red man" or "little red guy", and referring to C.S.B.'s product). The knife holder is sold under the trademarks THE EX and VOODOO.

6.      In 2007, C.S.B. learned that Urban Trend was seeking to introduce into the market a knife holder that traded on the popularity of the little red man knife holder.

7.      Urban Trend's knife holder was named the Throwzini, and incorporated C.S.B.'s little red man into a knife holder with a different configuration. (See Am. Comp. Exhibit B -- a photograph of the Throwzini knife holder).

8.      C.S.B. believed that the Throwzini knife holder constituted an infringement of C.S.B.'s exclusive rights in the little red man as an indication of origin for a knife holder, and initiated discussions with Urban Trend, through its president, Kushner, to resolve the dispute. The talks were ultimately fruitless. Urban Trend continued to market and sell the infringing Throwzini knife holder. At that time, C.S.B. had not seen any actual penetration of the American market by Urban Trend, although Kushner intimated he would not hold back in his attempts to sell the Throwzini.

9.      In early March of this year, C.S.B. learned that Urban Trend would, for the first time known to C.S.B., appear at a trade show in the United States, the International Home

2

+ Housewares Show 2008 ("IHH Show"), held in Chicago. C.S.B. believed that Urban Trend and Kushner would offer the Throwzini knife holder for sale at the IHH Show, a show at which C.S.B. would be selling its genuine product.

10.    I therefore authorized the preparation of the Complaint herein in the event that Urban Trend and Kushner actually came to the show to sell the infringing product in the same place C.S.B. was trying to sell its genuine product. I was in communication with counsel over the weekend to advise if Urban Trend and Kushner actually came to the show to sell the Throwzini knife holder.

11.    Saturday, March 15, 2008 was the official "set up day" for the show. C.S.B. went to the show to set up, and investigated whether, as was suspected, Urban Trend and Kushner would be offering the infringing product for sale at the show. C.S.B. learned that they would be there, and would offer the Throwzini for sale. On Sunday, March 16, 2008, C.S.B. attended the first formal day of the show and went to the Urban Trend booth. There, Urban Trend was displaying several versions of the infringing Throwzini knife holder (see photographs of the defendants' booth -- Am. Comp. Exh. C).

12.    Then, on Monday, March 17, 2008, having confirmed that both defendants were present in this District, and were actively engaging in selling the Throwzini, I authorized the filing of the Complaint herein. That same day, Mr. Kushner was served personally with the Summons and Complaint on the floor of the trade show, both as an individual and as President of Urban Trend.

13.    Wherefore, I request that defendants' motions to dismiss the Amended Complaint for lack of personal jurisdiction and for failure to state a claim be dismissed in their entireties.

_____
Robert Schmeizer

July 1, 2008