IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------x

C.S.B. COMMODITIES, INC.,

              Plaintiff,

              v.

URBAN TREND (HK) LTD., AND ROBERT KUSHNER,

              Defendants.

-------------------------------------------------------------x

Civil Action No. 1:08-cv-01548

Judge Robert M. Dow, Jr.
Magistrate Judge Morton Denlow

PLAINTIFF C.S.B. COMMODITIES, INC.'S
MEMORANDUM IN OPPOSITION TO
MOTION TO DISMISS FOR LACK OF
PERSONAL JURISDICTION

Plaintiff C.S.B. Commodities, Inc. ("CSB"), by its attorneys, hereby submits this Memorandum in Opposition to the motion [D.I. 30] made by the defendants, Urban Trend (HK) Ltd. ("Urban Trend") and Mr. Robert Kushner ("Kushner") for dismissal of the Amended Complaint [D.I. 24] for lack of personal jurisdiction.

Briefly, personal jurisdiction exists over both defendants since they were both served with process within the Northern District of Illinois while engaged in the activities that form the gravamen of the Amended Complaint.

## I.    FACTS

C.S.B. is a New York corporation engaged in the business of selling housewares (Declaration of Robert Schmeizer, ¶ 4; hereinafter: "Schmeizer Dec., ¶ ___"). One of C.S.B.'s products is a knife holder with a distinctive shape, namely that of a human figure leaning slightly backwards, with knife slots positioned throughout the figure's "body" (a photograph of C.S.B.'s product is Exh. A to the Amended Complaint; hereinafter "Am. Comp."). The falling down figure has acquired distinctiveness as an

indicator identifying the origin of knife holders offered for sale bearing that configuration. (Schmeizer Dec., ¶ 5). The figure has become known as "the little red man" (Schmeizer Dec., ¶ 5; Am. Comp. Exh. D).

C.S.B. learned that Urban Trend was seeking to introduce into the market a knife holder that traded on the popularity of the little red man knife holder. (Schmeizer Dec. ¶6). Urban Trend's knife holder was named the Throwzini, and incorporated the little red man into a knife holder with a different configuration (Schmeizer Dec., ¶ 7; Am. Comp. Exhibit B is a photograph of the Throwzini knife holder). C.S.B. believed that the Throwzini knife holder constituted an infringement of C.S.B.'s exclusive rights in the little red man as an indication of origin for a knife holder, and initiated discussions with Urban Trend, through its president, Kushner, to resolve the dispute. (Schmeizer Dec. ¶ 8). That proved unavailing. Urban Trend continued to market and sell the infringing Throwzini knife holder. (Schmeizer Dec., ¶ 8).

In early March of this year, C.S.B. learned that Urban Trend would, for the first time known to C.S.B., appear at a trade show in the United States, in Chicago, and offer for sale the Throwzini knife holder. (Schmeizer Dec. ¶ 9). The Complaint herein was prepared, in the event that the defendants actually had the audacity to offer to sell their infringing product at a show where C.S.B. would also be appearing and offering for sale its genuine product. (Schmeizer Dec. ¶ 10).

Saturday, March 15, 2008 was the official "set up day" for the show. (Schmeizer Dec., ¶ 11). C.S.B. went to the show to set up, and investigated whether, as was suspected, Urban Trend and Kushner would be offering the infringing product for sale at the show. (Schmeizer Dec., ¶ 11). C.S.B. learned that they would be there, and would

offer the Throwzini for sale. (Schmeizer Dec., ¶ 11). On Sunday, March 16, 2008, C.S.B. attended the first formal day of the show and went to the Urban Trend booth. (Schmeizer Dec., ¶ 11). There, Urban Trend was displaying several versions of the infringing Throwzini knife holder (Schmeizer Dec., ¶ 11; see, also, photographs of the Urband Trend booth -- Am. Comp. Exh. C).

Thus, on Monday, March 17, 2008, having confirmed that both defendants were present in this District, and were actively engaging in the acts of infringement which form the basis of this action, the initial Complaint herein was filed. (Schmeizer Dec., ¶ 12). That same day, Kushner was served personally with the Summons and Complaint on the floor of the trade show both as an individual and as President of Urban Trend. (Schmeizer Dec., ¶ 12; see, also, copies of the Affidavits of Service on the defendants [D.I. 12 and 13).

Thus, both defendants were served in this District while they were engaged in the very activities for which C.S.B. seeks redress in this action. It should be noted that this salient fact was omitted from the defendants' motion papers.

## II.    ARGUMENT

Personal jurisdiction exists over both defendants in this district, at least by virtue of the uncontested, and uncontestable, facts that (1) they were served in this jurisdiction while (2) they were actively engaged in infringing C.S.B.'s proprietary rights in this District, the very acts of which C.S.B. complains.

C.S.B., as the plaintiff, has the burden of proving the existence of personal jurisdiction over each defendant. *Nelson v. Park Ind.*, 717 F.2d 1120, 1123 (7th Cir. 1983). Since the instant motion is being decided on the submission of papers, with no

evidence offered by either defendant, C.S.B. need only make out a *prima facie* case to defeat defendants' motion to dismiss. *Id.* Additionally, for purposes of this motion, any and all disputes of fact must be resolved in C.S.B.'s favor. *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002).[1] When considering a motion to dismiss, the court must accept all well-pleaded allegations in the complaint as true. *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001). Neither defendant has offered any affidavit or other evidence in connection with the opening motion papers, and so C.S.B.'s allegations, both in the Amended Complaint and in the accompanying Declaration, must be accepted as true and unrebutted.

## A. THE AMENDED COMPLAINT NEED NOT ALLEGE FACTS RELATING TO PERSONAL JURISDICTION

The defendants argue that the Amended Complaint is defective for purportedly failing to allege facts relating to personal jurisdiction. Kushner has also argued, with respect to the Court's exercise of jurisdiction over him individually, that the Amended Complaint fails to allege facts supporting personal jurisdiction over him in his "individual capacity". (p. 3, Sec. II. B. of the moving papers). However, "a complaint need not include facts alleging personal jurisdiction". *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998). While a plaintiff bears the burden of establishing its *prima facie* case of personal jurisdiction in response to a motion to dismiss for lack of personal jurisdiction made under Fed.R.Civ.P 12(b)(2), the complaint

---

[1] "If personal jurisdiction is challenged under Rule 12(b)(2), the court must decide whether any material facts are in dispute. If so, it must hold an evidentiary hearing to resolve them, at which point the party asserting personal jurisdiction must prove what it alleged. Until such a hearing takes place, the party asserting personal jurisdiction need only make out a *prima facie* case of personal jurisdiction."

itself is not subject to challenge based on its alleged lack of pleading personal jurisdiction. Thus, this argument is without merit.

**B.     THE *INTERNATIONAL SHOE* TEST FOR "MINIMUM CONTACTS" IS SATISFIED AS TO EACH DEFENDANT.**

Under the Illinois long-arm statute, 735 ILCS 5/2-209(a)(i), a foreign corporation is subject to personal jurisdiction in Illinois courts for any cause of action arising out of its "transaction of any business" in Illinois. The exercise of personal jurisdiction over a non-resident defendant must also comport with the Fourteenth Amendment's requirements for "due process", which requires "minimum contacts" with the forum state. *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). (A defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The defendant's contacts must be "purposeful", meaning that the defendant has deliberately availed itself of the privilege of doing business in the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The contacts must also be such that the defendant should not be surprised at having to defend itself in the forum state as a result of its activities there. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980). Even a single act in the forum state may be sufficient to provide jurisdiction where that single act forms the basis for the complaint. *McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957).

In this case, each defendant purposefully traveled to Chicago of his/its own volition for the purpose of drumming up business and sales for the infringing products. Appearing at a trade show in Illinois for the purposes of drumming up sales of the goods which the plaintiff claims are infringing constitutes the "transaction of ... business"

within the meaning of the Illinois long-arm statute. *Westnofa USA Inc. v. British Design (U.S.A.) Corp.*, 1983 WL 420, at *2-3 (N.D. Ill. 1983 -- Exhibit 1 hereto).    It is disingenuous for either defendant to argue that it is surprised to be called to account for its actions in Chicago, when those actions form the very basis of this Complaint.    It would be odd, indeed, if an infringer could travel to Chicago to drum up business for an infringing product, try to make sales, meet customers and potential customers, promote its product, and then be permitted to steal away without having to face the consequences of its actions where they were performed.    This is particularly true where, as here, the infringer is served *in flagrante*, at the very moment he is infringing the plaintiff's rights.

Thus, the acts of which C.S.B. complains meet the standards for "minimum contacts" set by *International Shoe* and its progeny to establish that this Court has jurisdiction over the person of each defendant.

## C.    NO SALES ARE REQUIRED TO ESTABLISH PERSONAL JURISDICTION

Each defendant further claims that the Amended Complaint is defective since it does not allege that any single *sale* took place in Illinois (Defendants' Memo; p. 2). However, there is no need for there to have been a *completed* sale to find personal jurisdiction, where the defendants appeared at a trade show in Chicago in an *attempt* to sell the accused product and/or to create a market for the product. *Westnofa*, 1983 WL 420, at *2-3. Simply coming to Chicago in an attempt to further their business at a trade show constitutes transacting business in Illinois sufficient to satisfy both the Illinois long-arm statute and the *International Shoe* test for minimum contacts. *Id.* Thus, defendants' assertion that C.S.B. has failed to allege a single business transaction directed at a resident of Illinois is just wrong.

-6-

### D.    EACH DEFENDANT WAS SERVED IN THIS DISTRICT

As a further basis for establishing the Court's jurisdiction over each defendant, each defendant was actually served in this District while engaging in the conduct of which C.S.B. complains, and so this, too, weighs in favor of holding these defendants to account for their acts here.

### E.    THIS COURT HAS PERSONAL JURISDICTION OVER KUSHNER

This Court has jurisdiction over Kushner because, as noted above, he was personally served in this District while engaging in the acts of which C.S.B. complains, and the Amended Complaint satisfactorily alleges grounds on which a jury could find that he is personally liable for his actions.

### 1.    Kushner was Served with Process in this District.

It is well-settled that a Court may exercise personal jurisdiction over an individual who was served with process within the court's territorial boundaries, even if the presence was fleeting and for reasons unrelated to the suit. *Burnham v. Superior Court of California, County of Marin*, 495 U.S. 604 (1990).

In *Burnham*, the Court was presented with the following facts:

Mr. Burnham was a resident of New Jersey, whose wife had relocated to California with their children. Mr. Burnham visited California for business purposes and to see his children. While he was physically present in California, his wife served him with divorce papers. Mr. Burnham challenged the jurisdiction of the courts in California, since he was not a resident there, and since the reason for his presence in California was unrelated to the action for divorce. The Court found that personal jurisdiction existed

over Mr. Burnham solely by virtue of his voluntary physical presence in California, without regard to the reason for his presence there.

In reaching this conclusion, the Court studied the history of the issue and found:

> Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State. The view developed early that each State had the power to hale before its courts any individual who could be found within its borders, and that once having acquired jurisdiction over such a person by properly serving him with process, the State could retain jurisdiction to enter judgment against him, no matter how fleeting his visit. (pp. 610-11).

In explaining its conclusion that personal jurisdiction existed, the Court expressly, and succinctly, stated:

> The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of "traditional notions of fair play and substantial justice." That standard was developed by *analogy* to "physical presence," and it would be perverse to say it could now be turned against that touchstone of jurisdiction. (pp. 619).

Thus, with respect to Kushner, there is no question of personal jurisdiction, since he was served within the jurisdiction while he was voluntarily appearing at the trade show. His "capacity" or any other consideration alleged by him to avoid the jurisdiction of this Court is irrelevant.

## 2.    Kushner is liable to answer for his own conduct personally here in Chicago

In any event, the Amended Complaint contains sufficient allegations to make out a case establishing Mr. Kushner's responsibility for his own actions, including those performed in Chicago.

C.S.B. has alleged in the Amended Complaint that:

Kushner was the individual at Urban Trend who made the decision to go forward with the manufacture and/or marketing of the Throwzini knife holder and thereby trade on the goodwill associated with the EX/VOODOO knife holder and the Human Figure Design (Am. Comp. ¶ 20);

Kushner personally selected the configuration of the Throwzini knife holder and therefore deliberately and purposefully sought to trade on the goodwill established by C.S.B. in the EX/VOODOO knife holder (Am. Comp. ¶ 21);

Kushner personally directed others at Urban Trend to manufacture or have manufactured the Throwzini knife holder and to market the Throwzini knife holder in this district (Am. Comp. ¶ 22);

Kushner has been personally present in this district to offer the Throwzini knife holder for sale (Am. Comp. ¶ 23); and

Kushner stands to gain personally from the sales of the Throwzini knife holder (Am. Comp. ¶ 24).

Additionally, prior to the filing of the Complaint, but after its preparation, Kushner personally engaged in acts in this District to sell the accused products. (Schmeizer Dec., ¶ 12).

All malefactors in the chain of trademark infringement and unfair competition are personally liable for their own actions. *David Berg & Co. v. Gatto Intl. Trading Co., Inc.*, 884 F.2d 306, 311 (7th Cir. 1989) ("Every person actively partaking in, lending aid to, or ratifying and adopting such acts [*i.e.*, trademark infringement and unfair competition] is liable equally with the party itself performing these acts."). Kushner cannot therefore hide behind Urban Trend's corporate form to insulate himself from answering for his own tortious conduct. *GMAC v. Synergy Corp.*, 1992 WL 77682, at *1 (N.D. Ill. April 7, 1992 -- Exhibit 2 hereto) ("An officer can be found liable for any torts in which he took part even if he was acting on behalf of the corporation.").[2]

---

[2] Kushner has also moved for dismissal of the case against him personally on the grounds that he was an employee of Urban Trend and so is not personally responsible for his

For purposes of establishing personal jurisdiction over Kushner in this District, the acts of which C.S.B. has complained are sufficient to show Kushner's *personal* conduct with respect to the acts alleged and those facts, which must be taken as true, make more than a showing of a *prima facie* case against Kushner personally, particularly in the absence of *any* factual showing or denials by him in the moving papers.

## III.   CONCLUSION

Each Defendant has sufficient "minimum contacts" to establish that this Court has personal jurisdiction over him/it. Each appeared physically in this District to promote and market the accused product. Each was served in this District while engaged in the very conduct that forms the basis of the Complaint.

No infringer should be entitled to come into a forum, offer to sell its illicit wares under the very nose of the party whose rights are being infringed and then be allowed to thumb its nose at the justice system by claiming to be immune from suit for its actions simply by virtue of its "residence". That would undermine the legitimate rights of all holders of intellectual property throughout the United States, and allow infringers to hop in and out of any state in the Union, so long as they did not tarry so long as to establish "continuous and systematic contacts" with any single state, and then claim immunity from suit solely by virtue of being a foreign national or non-resident.

This is especially true where the defendants were caught in the act of infringement, and served with process *while in the very act of infringing*. No precedent exists to support a doctrine of "infringer immunity" when the infringer is caught, dead to

---

actions. That motion is being briefed concurrently and separately in full, and the arguments stated there will not be repeated here in any further detail.

rights, in a local forum, was served within the jurisdiction and then allowed to skip town without facing the consequences of his or its conduct.

For all of these reasons, therefore, it is respectfully urged that the Court deny defendants' motion to dismiss.

Dated:  July 1, 2008

By: _____
Martin B. Pavane, Esq.
Lisa A Ferrari, Esq.
Roger S. Thompson, Esq.
COHEN PONTANI LIEBERMAN & PAVANE LLP
551 Fifth Avenue
Suite 1210
New York, New York 10176
(212) 687-2770

Steven H. Sklar, Esq.
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza – Suite 4900
180 North Stetson Avenue
Chicago, IL  60601-6780
Tel.:  (312) 616-5600
Fax:  (312) 616-5700


Attorneys for Plaintiff
C.S.B. COMMODITIES, INC.

## <u>CERTIFICATE OF SERVICE</u>

Steven H. Sklar, an attorney, certifies that he served a copy of the foregoing Plaintiff C.S.B. Commodities, Inc.'s Memorandum in Opposition to Motion to Dismiss for Lack of Personal Jurisdiction on counsel of record for all parties entitled to service, as listed below, by electronic mail and by electronically filing same in accordance with the Court's electronic filing requirements on July 1, 2008:

Jeffrey G. Mote
James J. Lukas, Jr.
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601


/s/  Steven H. Sklar
Steven H. Sklar

# EXHIBIT 1



Not Reported in F.Supp.
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
(Cite as: 1983 WL 420 (N.D.Ill.))

Page 1

United States District Court, N.D. Illinois,
Eastern Division.
WESTNOFA USA INC. and HAG USA
INC., Plaintiffs,
v.
BRITISH DESIGN (U.S.A.) CORP.,
Defendant.
**No. 83 C 7209.**

November 8, 1983.
Theodore R. Scott Thomas C. Elliott, Jr.
McDougall, Hersh and Scott 135 S. La Salle
St. 60603, for plaintiff.

David Warner, President of British Design
999 Green St. San Francisco, California
94133, for defendant.

Melvin F. Jager Lee, Smith & Jager 150 S.
Wacker Drive 60606, for defendant.

Richard Backus Flehr, Hohbach, Test,
Albritton & Herbert Four Embarcadero
Center San Francisco, Ca. 94111, for
defendant.

MEMORANDUM OPINION AND ORDER

??, District Judge.

**\*1** Plaintiffs, Westnofa USA, Inc.
(Westnofa) and Hag USA, Inc. (Hag),
brought this declaratory judgment action
against defendant, British Design (U.S.A.)
Corporation (British Design), alleging that
defendant's promotion and distribution of its
'Back Chair' will infringe plaintiffs' patent
rights and violate the Trademark Act of
1946, 15 U.S.C. § 1125a, and the Illinois
Uniform Deceptive Trade Practices Act, Ill.
Rev. Stat. ch. 121- 1/2 , §§ 311-17. Plaintiffs
move for a preliminary injunction, and
defendant moves to dismiss for lack of
personal jurisdiction and venue. The court
heard evidence on all these motions in a
one-day hearing.

I. Factual Background.
 Westnofa and Hag market the 'Balans' Chair
in the United States through dealers that
include Scandinavian Design furniture
stores. The Balans Chair is a strange looking
sitting device in which the user sits on a seat
rest that is pitched forward and places his
knees on knee rests that prevent gravity
from pulling him off the seat. The chair
configuration opens the angle between the
spine and upper legs relieving pressure on
the back and neck and putting the body into
balance or, in Norwegian, balans. The chair
fascinates consumers. This fascination has
lead to the chair's commercial success.
Westnofa and Hag sell two versions of the
chair in the United States under an
assignment from the Norwegian inventors.

 One of these inventors, Hans Christen
Mensghol (Mensghol), noted at the hearing
how much time and effort went into the
development of the chair. He Worked with
three designers and several physicians and
therapists to perfect and document the
medical benefits of the chair. This work
generated much data about the value of the
design and resulted in the design patent,
United States Patent, No. Des. 265, 612, of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
**(Cite as: 1983 WL 420 (N.D.Ill.))**

which plaintiffs allege infringement. Mensghol has worked from approximately 1978 through 1982, when the patent issued, to the present to perfect the Balans chair.

Within approximately the past year, British Design has developed a chair with a forward pitched seat and knee rests similar to the Balans Chairs. It has received a shipment of at least 5,000 chairs from the Taiwanese manufacturer to market to discount stores and mail order houses. Several dealers have placed orders. British Design participated in one trade show in Illinois and attended another here in its attempt to enter the furniture market.

British Design's entry into this market has overtones of commercial piracy. For example, it used advertising copy almost identical to that written by plaintiffs for their dealers. The president of British Design, David Warner (Warner), testified that he copied most of the text from an advertisement used by the Back Store, one of plaintiffs' dealers in Boston. Warner incorporated British Design within the last year just as plaintiffs' chairs piqued the public's interest. Warner also testified that he explored the details of the market and that he knew of plaintiffs' chairs and their popularity while developing his chair.

**\*2** An officer of Westnofa saw British Design's display at a recent trade show at McCormick Place in Chicago. The plaintiffs contacted Warner to discuss either licensing British Design to market the chairs or stopping its distribution. These talks led nowhere. Plaintiffs filed this suit in the Northern District of Illinois alleging that British Design's sale of the chairs will violate Westnofa's and Hag's patent rights,

their rights under the Trademark Act, and their rights under the Illinois Deceptive Practices Act. British Design moved to dismiss, arguing that the court lacked jurisdiction and that venue in the Northern District of Illinois is improper. The court finds that it has jurisdiction but that venue is improper. The court transfers the case to the Northern District of California.

II. Discussion.
A. Personal Jurisdiction.

Section 2-209 of chapter 110 of the Illinois Revised Statutes provides this court with long-arm jurisdiction over British Design. That section states in part that:

'Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this State[.]'

See also Fed. R. Civ. P. 4(e) (allowing a federal court to use the long-arm statute of state in which it sits).

When a party solicits sales in Illinois, the solicitation can confer personal jurisdiction under the transaction of business clause. E.g., Morton v. Environmental Land Systems, 55 Ill. App.3d 369, 372 (1st Dist. 1977). '[A]ctivities such as the solicitation of a contract is the transaction of business within the statutory definition even where the actual acceptance of the contract occurred outside of the forum and where it was to be governed by nonforum law.' Id. '[A] single transaction of business rather than a prolonged series of transactions can

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
**(Cite as: 1983 WL 420 (N.D.Ill.))**

be sufficient.' Id.; see also Ragold v. Ferrero, U.S.A., 506 F. Supp. 117, 120 (N.D. Ill. 1980) (court had personal jurisdiction where complaint arose from defendant's advertising in the state).

British Design had several contacts with Illinois that submit it to this court's jurisdiction. It solicited business at the McCormick Place trade show. It sold a sample to a mail order house in Chicago to interest it in carrying British Design's product. The national sales manager attended another Illinois trade show to 'check out' the competition. All these acts were designed to make sales within Illinois. Plaintiff complains about the advertising and sale of defendant's chairs. Since British Design's contacts with Illinois involved advertising and selling its Back Chair, the long-arm statute applies.

Application of the long-arm statute to British Design must conform with the minimum contacts test of International Shoe v. Washington, 326 U.S. 310, 316-21 (1945). British Design must have minimum contacts with Illinois sufficient to prevent the assertion of jurisdiction from offending 'traditional notions of fair play and substantial justice.' Id. at 316. This concept requires ome type of voluntary association 316. This concept requires some such association. World-Wide Volkswagen v. Woodson, 444 U.S. 286, 294 (1980); Hanson v. Denckla, 357 U.S. 235, 253 (1958); International Shoe, 326 U.S. at 319-20.

**\*3** British Design's contacts with Illinois meet this test. It came to Illinois to sell its product. It sent a sample into the state to encourage Spiegal, a large mail order house

based in Chicago, to buy its products. The association with the forum was voluntary even though Warner testified that he 'had no choice' about coming to the trade show to sell his product. This was a realization that for British Design to succeed in its chosen field it had to go to the heart of the industry. A business motive led British Design to Illinois. Warner discussed the valuable benefits obtained through its attendance at the trade show in Illinois. The contacts meet the Shoe test.

### B. Subject Matter Jurisdiction over the Declaratory Judgment Action.

The court disagrees with defendant that this case lacks the actual controversy necessary to provide jurisdiction over count I under the Declaratory Judgment Act, 28 U.S.C. § 2201. The defendant has taken orders and accepted a shipment of allegedly infringing products. It intends to market the products as soon as it can ship them out. This ability and intent to immediately accomplish the allegedly infringing acts creates a sufficient controversy. E.g., Automation Systems v. Intel, 501 F. Supp. 345, 346-48 (S.D. Iowa 1980) ('[T]he Court must determine 'if the party charged is about to infringe or [has taken] some action which is prejudicial to the interests of the patentee.") (quoting Proler Steel v. Luria Brothers, 223 F. Supp. 87, 90 (S.D. Tex. 1963)); Pullman, Inc. v. W. R. Grace & Co., 437 F. Supp. 1062, 1066 (W.D. Okla. 1976) (actual controversy can exist where defendant has 'an immediate capability and intent to produce an allegedly infringing item').

### C. Venue.

This case involves the interaction of two venue provisions in the United States Code: sections 1391(b) and 1400(b) of chapter 28.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
**(Cite as: 1983 WL 420 (N.D.Ill.))**

Section 1391(b) allows a lawsuit 'wherein jurisdiction is not founded solely on diversity of citizenship' to 'be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.' A corporation is a resident of 'any judicial district in which it is incorporated or licensed to do business or is doing business.' § 1391(c). Section 1400(b) governs venue in patent infringement cases by allowing such suits 'in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.'

Although this case involves an alleged future infringement of plaintiff's patent, section 1400(b) is inapplicable since section 1391 determines venue in declaratory judgment actions. Proler Steel v. Luria Brothers, 223 F. Supp. 87, 91 (S.D. Tex. 1963); cf., e.g., United States Aluminum v. Kawneer Co., 694 F.2d 193, 195 (9th Cir. 1982) (section 1391, not 1400(b), governed action for declaratory judgment that patents were invalid and not infringed). In Proler Steel, the court discussed how Congress meant section 1400(b) to apply to only that unique form of action known as the 'patent infringement suit' in which the plaintiff must allege that some act of infringement has taken place. 223 F. Supp. at 91. As in Proler Steel, Westnofa alleges only future infringement. This is merely a declaratory judgment action involving future patent infringement. Section 1391 governs venue.

**\*4** Under section 1391, Westnofa must establish one of four facts to lay venue in this district: (1) British Design is incorporated in the district; (2) it is licensed to do business there; (3) it is doing business

there; or (4) the claim arose there. Westnofa argues neither of the first two conditions, and the evidence shows that neither applies. The other two conditions require more attention.

When Congress used the term 'doing business,' it required more activity to establish venue than the minimum contacts necessary to satisfy the Constitution. E.g., Conaway Enterprises v. Dyna Industries, 547 F. Supp. 577, 579 (W.D. Pa. 1982); Lubrizol Corp. v. Neville Chemical, 463 F. Supp. 33, 36 (N.D. Ohio 1978). Some courts require contacts so significant that a license would be necessary to conduct business properly. North Eastern Timber (U.S.A.) v. Pines Trailer Corp., 501 F. Supp. 321, 322 (E.D. Pa. 1980); Trinity Metals v. Andy International, 424 F. Supp. 966, 968 (E.D. Pa. 1977) (applying a federal standard to determine whether license was required). At the least, courts demand that the defendant conduct some continuous and systematic activity in the district. First Pullen Commodity Services v. A. G. Becker-Kipnis & Co., 507 F. Supp. 770, 773 (S.D. Fla. 1981).

British Design's activities within the Northern District of Illinois fail to meet the 'doing business' prong of the venue provision. Its contacts with Illinois were isolated and sporadic. Although its solicitations gave rise to the cause of action in the complaint, they were minimal compared to the contacts necessary to require a license or to pursue any significant business enterprise within the state. British Design has no offices, employees, dealers, or property in the district. The court refuses to find that it does business here under section 1391.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                          Page 5
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
**(Cite as: 1983 WL 420 (N.D.Ill.))**

In determining where the claim arose for venue purposes, courts consider the 'weight of the contacts.' McDonald's Corp. v. Congdon Die Casting Company, 454 F. Supp. 145, 148 (N.D. Ill. 1978); Honda Associates v. Nozawa Trading, 374 F. Supp. 886, 891 (S.D.N.Y. 1971). '[T]he claim should not be deemed to have arisen in a district in which the defendant has had only miniscule contact, and that entirely by mail.' Honda Associates, 374 F. Supp. at 892. In Seabrook Foods v. Seabrook Brothers, 495 F. Supp. 792, 793 (S.D.N.Y. 1980), a trademark infringement suit, the court found that less than one-sixth of the defendant's total sales took place within the district. 495 F. Supp. at 793-94. This was insufficient to find that the claim arose in the district for venue purposes.

In British Design's case, the 'weight of the contacts' is miniscule, especially considering British Design's strong connection to the Northern District of California. Westnofa's suit seeks to prevent a coordinated, infringing marketing of defendant's Back Chairs that will undercut Westnofa's market position. British Design's effort has taken place almost exclusively in California. Its offices, employees, advertising materials, inventory, and shipping facilities are all located in that district. Most of the harm to Westnofa will arise from acts committed in that district. Therefore, although British Design transacted sufficient business in Illinois to give this court power over it, its activities are insufficient to find that Congress intended to set venue in the district on the grounds that the claim arose here. As the court noted in Honda Associates, section 1931 failed to confer 'the right to sue where any part of the claim, however small, arose.'

374 F. Supp. at 892.

**\*5** Plaintiffs' citation of Chicago Reader v. Metro College Publishing, 495 F. Supp. 441, 443 (N.D. Ill. 1980), is unpersuasive. That court agreed that for venue to lie, the contacts must be 'more than miniscule.' Id. at 443. In that case, the defendant had conducted detailed telephone and postal solicitations, negotiations, and sales within the district. Id. Although few copies of defendant's newspaper reached Illinois, defendant allegedly had billed Illinois advertisers for at least $43,000. Id. The plaintiff complained about losing its advertisers to defendant. Id. This loss arose directly from activity in the district. Id. In British Design's case, although it committed alleged misconduct in Illinois, the vast majority of conduct about which the plaintiffs complain will take place in California.

Under section 1406(a), 'The district court of a district in which is filed a case laying venue in the wrong . . . district shall . . . if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.' Because the complaint may have some merit and the parties have invested resources before this court to determine how much merit, the court sees justice in transferring the case to the Northern District of California.

### III. Conclusion.
The court transfers the case to the Northern District of California.

Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1983 WL 420 (N.D.Ill.), 222 U.S.P.Q. 136
**(Cite as: 1983 WL 420 (N.D.Ill.))**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 2



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

Page 1

General Motors Acceptance Corp. v.
Synergy Corp.
N.D.Ill.,1992.
Only the Westlaw citation is currently
available.
United States District Court, N.D. Illinois,
Eastern Division.
GENERAL MOTORS ACCEPTANCE
CORPORATION, Plaintiff,
v.
SYNERGY CORPORATION, Theo D'Oro,
National Vehicle Placement Management
Consultants, Inc., and Michael Jacobs,
Defendants.
**No. 90 C 3522.**

April 7, 1992.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge
**\*1** General Motors Acceptance Corporation
("GMAC") has filed a complaint alleging
violations of the Lanham Act, 15 U.S.C. §
1125(a), and the Illinois Deceptive Trade
Practices Act ("IDTPA"), Ill.Rev.Stat., ch.
121 1/2 , § 312, as well as alleging tortious
interference with contract. Defendants,
National Vehicle Placement Management
Consultants, Inc. ("National") and Michael
Jacobs ("Jacobs"), the President of National,
have moved for summary judgment.

FACTS

GMAC finances the purchase of motor
vehicles by its customers through retail
installment contracts and lease agreements.

The motor vehicle is GMAC's collateral in
connection with such contracts. GMAC can
repossess the vehicles in the case of a
default. The contracts specify that a
customer may not sell or transfer a vehicle
without GMAC's approval. GMAC
complains that defendants are interfering
with its contractual relations with customers
by inducing them to transfer their cars, in
violation of their contracts, to vehicle
brokerages established by National (the
"brokerages").

National is in the business of establishing
vehicle brokerages which resell or release
vehicles. According to GMAC, the
brokerages use newspaper advertisements
and other means to induce GMAC
customers to assign them their retail
installment sales contracts and leases. Some
GMAC customers have transferred their
vehicles in apparent violation of contract.
The transfers were not made to National, but
to the brokerages National had established
and to whom National continued to provide
consulting services. National acknowledges
providing certain form contracts, training
employees, coordinating advertisements
among brokerages, and referring customers,
but denies any wrongdoing. National
contends that if any violations occurred, the
brokerages alone are liable.

DISCUSSION

To prevail in a motion for summary
judgment, the moving party must establish
there are no genuine issues of material fact

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court must construe all factual inferences in the light most favorable to the non-moving party. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984).

### I. The Counts Against Jacobs

Defendants first contend that the court should grant summary judgment in favor of Jacobs because he acted solely as the employee and agent of National. They argue the corporate veil cannot be pierced in this case. Defendants are not correct. An officer can be found liable for any torts in which he took part even if he was acting on behalf of the corporation. *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740, 753 (7th Cir.1985); *Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089, 1093 (N.D.Ill.1985). Because Jacobs cannot hide behind his agency role, the court denies his motion for summary judgment on Counts I, II, and III.

### II. The Lanham Act Count

Construed in the most favorable light, plaintiff alleges two alternative theories under the Lanham Act. First, plaintiff suggests National aided the brokerages in deceiving customers. The Lanham Act provides, in pertinent part:

**\*2** Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading representation of fact, which-(2) in commercial advertising or promotion, misrepresents the nature, character, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable.

15 U.S.C. § 1125(a). Plaintiff alleges that defendants assisted the brokerages in misleading GMAC's customers into believing that assigning their contracts would not infringe the rights of GMAC.

Second, plaintiff indicates National misled the brokerages themselves into believing their actions were within the law. Plaintiff alleges that National led the brokerages to believe that transfer of the lienholder's collateral, the vehicles, would not infringe on the lienholder's rights.

Plaintiff fails to distinguish its theories clearly, but at least the first sufficiently alleges a claim for contributory misrepresentation that defeats summary judgment. Defendants argue that, as mere consultants to the brokerages, they cannot be liable for any wrongdoing. Defendants point out that the consulting agreements specifically delineate that the brokerages are separate entities and that National has no control over their operations. Defendants' arguments about control of the brokerages is not a sufficient basis for summary judgment on this count. The Seventh Circuit has found that a corporation or a person may be held liable for contributory trademark infringement under the Lanham Act without directly deceiving customers. *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir.1989). Although this is more accurately a case of contributory misrepresentation than contributory infringement, the same analysis applies. For contributory liability, one must have knowledge, or reason to know, of the infringing activity of the primary infringer. *Id.* What National knew of the activities of the brokerages is a question of fact which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 3
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

the court cannot resolve at this time. At trial, the court can determine if National induced the brokerages to misrepresent the nature of their activities to GMAC customers or knowingly aided them in interfering with GMAC's contract rights.

GMAC has met its burden to defeat summary judgment. It has sufficiently identified portions of National's promotional materials which could be construed as intended to induce the brokerages to mislead customers. In addition, the Jacobs' affidavit indicates he may have had reason to know of the brokerages' activities. The court does not impute the statements of the brokerages to National but rather looks to the statements of National itself. On this basis, the court denies defendants' motion for summary judgment on Count I.

### III. The Interference With Contractual Relations Count

In Count II, GMAC alleges that National intentionally and maliciously induced GMAC customers to breach their contracts. Plaintiff alleges defendants provided assistance to the brokerages for the purpose of enabling them to induce the contract breaches. Defendants ask for summary judgment on the ground that plaintiff never alleges any direct interference, or even contact, with the customers by defendants. Defendants suggest that plaintiff's only legitimate cause of action is against the brokerages. Defendants ignore the possibility that a defendant may be liable for substantially assisting another party to commit a tort.

**\*3** Plaintiff has offered sufficient evidence to defeat summary judgment. It has alleged

that National coordinated and facilitated the brokerages' communications with customers and that National provided the contract forms for the transfer of the vehicles. Whether these acts were intended to enable the brokerages to interfere with GMAC's contractual relations is a question of fact which cannot be resolved on summary judgment. Plaintiff's affidavits support its contention that defendants at least had knowledge of the brokerages' activities. While the language of the form contracts and the consulting agreements, at best, only marginally support plaintiff's allegations, the court will give plaintiff a chance to make its case. Defendants' intent and knowledge are the key factors in determining whether its indirect actions can support a claim of liability for interference with contractual relations. Therefore, the court denies defendants' motion for summary judgment on Count II.

### IV. The IDTPA Count

Plaintiff alleges defendants engaged in conduct which created "a likelihood of confusion or of misunderstanding" in violation of the IDTPA. Ill.Rev.Stat., ch. 121 1/2 , § 312. Defendants again argue that plaintiff has produced insufficient evidence to show that defendants personally engaged in such conduct. Defendants suggest that the proper defendant for this claim is the brokerages.

Plaintiff, however, alleges direct action by defendants in Count III. Count III is apparently based on plaintiff's second theory, that defendants attempted to deceive the brokerages. GMAC points to defendants' promotional materials which allege that the transfer of lienholder's collateral would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.))**

"benefit all parties concerned." To prevail under the IDTPA, plaintiff need not prove actual confusion or misunderstanding. Although in the context of the entire bulk of promotional materials, documents, and communications with the brokerages, the possibility of confusion or misunderstanding may be less than plaintiff claims, for purposes of a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. On that standard, the promotional material creates a question of material fact which defeats summary judgment.

### CONCLUSION

The court denies defendants' motion for summary judgment.

IT IS SO ORDERED.

N.D.Ill.,1992.
General Motors Acceptance Corp. v. Synergy Corp.
Not Reported in F.Supp., 1992 WL 77682 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------------------------------x

C.S.B. COMMODITIES, INC.,

                Plaintiff,

        v.

URBAN TREND (HK) LTD., AND ROBERT KUSHNER,

             Defendants.

---------------------------------------------------------------x

Civil Action No. 1:08-cv-01548

Judge Robert M. Dow, Jr.
Magistrate Judge Morton Denlow

DECLARATION OF ROBERT
SCHMEIZER

## DECLARATION OF ROBERT SCHMEIZER

The undersigned, Robert Schmeizer, hereby declares as follows:

1.     I am president of Plaintiff, C.S.B. Commodities, Inc. ("CSB"), and I submit this Declaration in Opposition to the motions made by the defendants, Urban Trend (HK) Ltd. ("Urban Trend") and Mr. Robert Kushner ("Kushner"), for dismissal of the Amended Complaint for lack of personal jurisdiction and by Kushner for dismissal of the Amended Complaint for failure to state a claim.

2.     I make the following statements with the knowledge that false statements are punishable as perjury.

3.     The following statements are true to my own knowledge, except for those statements made "upon information and belief", which statements are believed to be true after an investigation into the facts so stated and with the belief that the facts are true.

4.     C.S.B. is a New York corporation engaged in the business of selling housewares. One of C.S.B.'s products is a knife holder with a distinctive shape, namely that of a

human figure leaning slightly backwards, with knife slots positioned throughout the figure's "body" (a photograph of C.S.B.'s product is Exh. A to the Amended Complaint; hereinafter "Am. Comp.").

5.      Upon information and belief, the falling down figure has acquired distinctiveness as an indicator identifying the origin of knife holders offered for sale in that configuration. The figure has even become known among the purchasing and business community as "the little red man" (see, *e.g.*, Am. Comp. Exh. D, copies of blogs mentioning the "little red man" or "little red guy", and referring to C.S.B.'s product). The knife holder is sold under the trademarks THE EX and VOODOO.

6.      In 2007, C.S.B. learned that Urban Trend was seeking to introduce into the market a knife holder that traded on the popularity of the little red man knife holder.

7.      Urban Trend's knife holder was named the Throwzini, and incorporated C.S.B.'s little red man into a knife holder with a different configuration. (See Am. Comp. Exhibit B -- a photograph of the Throwzini knife holder).

8.      C.S.B. believed that the Throwzini knife holder constituted an infringement of C.S.B.'s exclusive rights in the little red man as an indication of origin for a knife holder, and initiated discussions with Urban Trend, through its president, Kushner, to resolve the dispute. The talks were ultimately fruitless. Urban Trend continued to market and sell the infringing Throwzini knife holder. At that time, C.S.B. had not seen any actual penetration of the American market by Urban Trend, although Kushner intimated he would not hold back in his attempts to sell the Throwzini.

9.      In early March of this year, C.S.B. learned that Urban Trend would, for the first time known to C.S.B., appear at a trade show in the United States, the International Home

+ Housewares Show 2008 ("IHH Show"), held in Chicago. C.S.B. believed that Urban Trend and Kushner would offer the Throwzini knife holder for sale at the IHH Show, a show at which C.S.B. would be selling its genuine product.

10.    I therefore authorized the preparation of the Complaint herein in the event that Urban Trend and Kushner actually came to the show to sell the infringing product in the same place C.S.B. was trying to sell its genuine product. I was in communication with counsel over the weekend to advise if Urban Trend and Kushner actually came to the show to sell the Throwzini knife holder.

11.    Saturday, March 15, 2008 was the official "set up day" for the show. C.S.B. went to the show to set up, and investigated whether, as was suspected, Urban Trend and Kushner would be offering the infringing product for sale at the show. C.S.B. learned that they would be there, and would offer the Throwzini for sale. On Sunday, March 16, 2008, C.S.B. attended the first formal day of the show and went to the Urban Trend booth. There, Urban Trend was displaying several versions of the infringing Throwzini knife holder (see photographs of the defendants' booth -- Am. Comp. Exh. C).

12.    Then, on Monday, March 17, 2008, having confirmed that both defendants were present in this District, and were actively engaging in selling the Throwzini, I authorized the filing of the Complaint herein. That same day, Mr. Kushner was served personally with the Summons and Complaint on the floor of the trade show, both as an individual and as President of Urban Trend.

3

13.    Wherefore, I request that defendants' motions to dismiss the Amended Complaint for lack of personal jurisdiction and for failure to state a claim be dismissed in their entireties.

_____
Robert Schmeizer


July 1, 2008